**JACOB ARONAUER, ESQ.**
Law Offices of Jacob Aronauer
225 Broadway, Suite 307
New York, New York 10007
(212) 323-6980
jaronauer@aronauerlaw.com

November 12, 2015

**By ECF and regular mail**
Hon. William H. Pauley
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1920
New York, NY 10007

Re: Antonio Garcia v. Bad Horse Pizza, Inc. et al.
14-cv-08858 (WHP)

Your Honor:

I am co-counsel for the Plaintiff, Antonio Garcia, in the above-entitled action. As per this Court's request at today's conference, annexed please find the September 14, 2015 deposition transcript of Mr. Garcia.

Respectfully,

Jacob Aronauer

cc: **By ECF**
Rachel Minter
*Attorney for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTONIO BAUTISTA GARCIA, )
Plaintiff, )
) INDEX NO.
- against - ) 14 CV 8858
) (WHP)(JCF)
BAD HORSE PIZZA, INC., JOHN KANDEL )
and OMAR GUZMAN, individually, )
Defendants. )
______)

345 Seventh Avenue
New York, New York

September 14, 2015
10:06 a.m.

Deposition of the Plaintiff, ANTONIO BAUTISTA GARCIA, held at THE LAW OFFICE OF RACHEL J. MINTER, pursuant to Notice, before LINDA DEVECKA, a Notary Public of the State of New York.

Page 2

APPEARANCES:

THE LAW OFFICE OF JACOB ARONAUER
Attorney for Plaintiff
225 Broadway, Suite 307
New York, New York 10007
BY: JACOB ARONAUER, ESQ.

THE LAW OFFICE OF RACHEL J. MINTER
Attorney for Defendants
345 Seventh Avenue, 21st Floor
New York, New York 10001
BY: RACHEL J. MINTER, ESQ.

ALSO PRESENT:
BLANCA ALONSO, SPANISH INTERPRETER
JOHN KANDEL
OMAR GUZMAN
SIAN RICKETTS

- oOo -

Page 3

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

- oOo -

Page 4

BLANCA ALONSO, an interpreter, having been duly sworn by a Notary Public, translated as follows:

ANTONIO BAUTISTA GARCIA, called as a witness, having been duly sworn through the interpreter by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. MINTER:

Q. Mr. Garcia, my name is Rachel Minter. I represent Bad Horse Pizza, John Kandel, and Omar Guzman in this case.
This is the restaurant where you used to work and the two individuals that you used to work with. You sued them claiming that you have not been paid as much money as you believe you should have.
I am going to be asking you questions today regarding your lawsuit. You are answering these questions under oath, and that is under penalty for perjury.
Do you understand what perjury is?
A. More or less.
Q. It means you have to tell the truth.
A. Okay.

Page 5

Garcia

Q. Different than just talking to a friend. It means you are legally responsible for the truth of your answers.
Have you ever testified in a legal proceeding before?
A. No.
Q. If you do not understand a question that I ask you, you should please indicate that.
A. That's fine.
Q. If you answer the question, I will assume that you understand it.
A. That's fine.
Q. You cannot consult with your lawyer during the deposition, especially when there is a question pending.
MR. ARONAUER: I am going to object to that statement.
MS. MINTER: She hasn't finished translating it yet. If you want your client to have an interpreter you have to let her do what she does.
MR. ARONAUER: I am going to object to that statement in that it's inaccurate. He does not have a right to talk to me while a question

Page 6

Garcia

is pending. However, at the conclusion of an answer, when you are done finishing an answer, you have the right if you want to take a break to talk to me.

MS. MINTER: Subject of course to the abuse of that privilege, as every five minutes consulting with your attorney.

THE WITNESS: I can take a break when I want it?

MS. MINTER: Yes, absolutely.

Q. If you need a drink of water or to go to the bathroom, you should indicate that. The exception is if there is a question that has been asked. You cannot leave before you have answered a question.

A. Okay.

Q. Do you understand that?

A. Yes.

Q. Mr. Garcia, are you taking any medication which might impair your ability to understand or answer questions today?

A. Yes, I am taking medicine but it doesn't affect me at all.

Q. If it doesn't affect you, then why are you

Page 7

Garcia

taking it?

A. I am referring that that does not affect me in the way that I would answer the questions.

Q. Mr. Garcia, have you discussed your testimony today with anyone other than your lawyers?

A. With my roommate.

Q. What did you tell your roommate?

A. We were just talking about the case, how is it going.

Q. Is that the first conversation you have had about the case with your roommate?

A. Since the case began, no.

Q. How many conversations would you say since the case began that you had with your roommate?

A. Since it began.

Q. More than five?

A. Yes.

Q. More than ten?

A. I haven't counted them.

Q. Somewhere between five and ten?

A. It could be.

Q. Do you speak with your roommate about personal matters in general?

A. We talk about everything.

Page 8

Garcia

Q. Are you in any kind of relationship with your roommate?

A. No. Only friends.

Q. How long have you been roommates?

A. Three years.

Q. What is your roommate's name?

A. Armando Santos.

MS. MINTER: Could you spell that for the court reporter, please?

THE INTERPRETER: A-r-m-a-n-d-o, Santos, S-a-n-t-o-s.

Q. Did you discuss the case before it began with Mr. Santos?

MR. ARONAUER: Objection.

MS. MINTER: On what grounds? He said after the case began I talked to him, and now I am asking him about before the case began.

MR. ARONAUER: I'm not telling him he can't answer the question. I am objecting to the form of the question.

Q. Before the case began, before you filed it in Federal Court, did you speak with Mr. Santos about the claims in the case?

A. No.

Page 9

Garcia

Q. At what point in the case did you start talking to Mr. Santos about the case?

A. When I filed the claim.

Q. You came home and said, hey, I filed a claim in Federal Court today; is that kind of how it went?

MR. ARONAUER: Objection.

A. No.

Q. What did you tell him? What did you say to Mr. Santos?

A. It was just a normal conversation between friends.

Q. Do you normally discuss filing federal litigation with your friends?

A. No.

Q. So that's not a normal topic of conversation for you and your friends, is it?

A. I talk about this subject because he is the one closer to me.

MS. MINTER: I don't think that's responsive to the question.

Can you read it back.

(Question read.)

Q. Referring to filing a lawsuit in Federal

Page 10

Garcia

Court. Is that a normal topic of conversation for you and your friends?

A. I repeat, he is the person that is closer to me. He is the one that I can talk to. I don't have a family here.

Q. I am sorry, Mr. Garcia, I am going back to your use of the term "a normal conversation between friends." That was your term.

MR. ARONAUER: Objection. Asked and answered.

Q. What did you mean by the use of the word "normal"?

MR. ARONAUER: Objection to form.

A. Conversation with him is normal because -- I don't know. I don't have anyone else to talk with. He is my best friend here. So we don't hide anything from each other. We try to have conversations about everything that is happening.

Q. Did you tell Mr. Santos when you were terminated from employment at Bad Horse Pizza?

A. Yes.

Q. What did you tell him?

A. That I was being fired while I was not present here in New York.

Page 11

Garcia

Q. Where were you when you were fired?

A. California.

Q. How did you learn you were fired?

A. Mr. Kandel sent me a message.

Q. Sent you a message.

What kind of message?

A. He sent me a message saying that I shouldn't go to work on Thursday, that I should go Friday so that he can talk to me.

Q. Where did he leave the message?

A. On the phone. He sent me a text message.

Q. Do you still have the text message?

A. Yes.

Q. Do you have your phone with you?

A. Yes.

Q. Can you show it to me?

MS. MINTER: This should have been produced by counsel, but we will just make it easy by having you show it to me now.

MR. ARONAUER: I am going to have to object.

MS. MINTER: You were supposed to produce these things, and you represented to me that you produced everything that was responsive to the

Page 12

Garcia

Notice of Deposition, which had certain items in it that he was supposed to bring to the deposition. And all you did was copy what we sent you and sent it back to me. Obviously a text message from Mr. Kandel to Mr. Garcia in which he claims he was terminated would be very relevant, but you didn't turn that over.

MR. ARONAUER: Ms. Minter --

MS. MINTER: I will of course take this up with the judge, but I want to see it now.

MR. ARONAUER: Ms. Minter, I would appreciate it that when I start talking that you not interrupt me and give me the opportunity to respond.

MS. MINTER: Sure, go ahead.

Why didn't you produce the text?

MR. ARONAUER: Ms. Minter, my response to the issue is as follows: I believe that we provided you all relevant information that pertains to what is a wage and hour lawsuit. This is not an unlawful termination case. By the same token, if you think that this text message is so relevant, I should note that it was your client who sent the text message to my

Page 13

Garcia

client, so therefore I would have to assume that this text message in question is also in your possession. I am not going to allow my client to show a text message without me having the opportunity to review it and go over it. If you object to my objection, you are more than welcome to call the magistrate judge.

MS. MINTER: The magistrate judge, by the way, has not been appointed to supervise the deposition, so we would have to talk to Judge Pauley, and then of course if we don't finish with the deposition today because we have to break it up to talk to Judge Pauley about your transigents, then we will have to come back another day. If you would like, we can take a five-minute break and Mr. Garcia can show you the text message and you can talk to him and you come back and show it to me. If that's what your concern is, we can have the break.

MR. ARONAUER: I would like the opportunity to prep my client.

MS. MINTER: No. If you are instructing him not to produce the text in which he claims he was told he was terminated while he was in

Page 14

Garcia

California, then you are instructing him not to answer.

MR. ARONAUER: I am not instructing him not to answer.

MS. MINTER: Yes, you are. You are telling him don't show me the text.

We will try it this way.

Q. Mr. Garcia, what did the text say that Mr. Kandel supposedly sent you? In the exact words as you can remember them.

A. I don't remember exactly.

Q. Well, what do you remember?

A. He sent me a text message saying that he was wishing me safe travel, that I shouldn't go to work on Thursday, that I should go Friday because Omar Guzman and he, they wanted to talk to me.

Q. I am sorry. You testified earlier that you were fired while you were in California, is that correct?

A. Yes.

Q. Was there anything in that text message about firing you?

A. Yes. I was asking why I shouldn't present to work on Thursday, and he said that he was

Page 15

Garcia

referring to --

MS. MINTER: You are going to have to speak slowly enough for the interpreter to interpret your remarks.

Do you want the question read back?

THE INTERPRETER: I just answered the first part of his answer, but I didn't get the last part of his answer.

MS. MINTER: Read him the question back and we will take him a little slower.

(Question read.)

A. He said that he found out about things that I have done while he was not there, and all the employees complain about me, and he also talked to me about one order that I have taken more than an hour, but that order, I had done that order like more than a month before that.

Q. This was all in the text message that Mr. Kandel sent you?

A. We had a conversation. He was sending me and I was answering him.

Q. Your testimony that you were notified about being fired in the first text is not correct, is it? Is it? That was wrong?

Page 16

Garcia

A. I don't understand. Can you repeat the question?

Q. You said you got a text from Mr. Kandel in California informing you that you had been fired; a text?

A. Yes.

Q. You got a text.

The first one we are talking about now that your lawyer refuses me to see, that was the one that fired you?

A. It was not on the first one, it was during the conversation.

Q. When you say "conversation," were you talking with Mr. Kandel on the telephone?

A. Messages.

Q. That's talking, exchanging text messages?

A. Only messages.

Q. Was this in English or Spanish?

A. In English.

Q. So you understand and read English well enough to have a text message conversation with Mr. Kandel in English?

A. I used a translator. I don't understand very well English.

Page 17

Garcia

Q. Was a translator there for the entire time you were trading messages with Mr. Kandel?

A. It's an app that I have on my phone.

Q. Can I see that?

A. It's Google translation.

Q. How long does it take you to get a translation of a text?

A. Less than a minute.

Q. How long did the total text exchange between you and Mr. Kandel when you were in California take?

A. No more than five minutes.

Q. About how many texts were exchanged between the two of you while you were having this conversation?

A. I don't remember. I should check the messages.

MS. MINTER: I would love to see them, but your lawyer says I am not allowed to see them. So when the judge tells you that you have to let me see them, we will find out.

MR. ARONAUER: Objection. I would like to note my objection, please.

MS. MINTER: You did. Stop yelling.

Page 18

Garcia

MR. ARONAUER: I am not yelling. I don't appreciate you stating that I am yelling. I am not yelling. When I make an objection, I would appreciate it, though, if you would let me finish the basis for my objection. I think that's fair to ask.

MS. MINTER: Okay. Go ahead.

MR. ARONAUER: Ms. Minter, I ask that if you are going to make statements or speeches, you do it for another time.

MS. MINTER: Okay, Mr. Aronauer.

MR. ARONAUER: I would also like to note that at no point in time did I receive document requests from you.

MS. MINTER: We are not talking about document requests now, we are talking about your client's deposition and e-mails he exchanged with his boss that he claims terminated his employment. Now if you don't think that's relevant, you can take it up with Judge Pauley. I am not going to talk about other discovery now.

MR. ARONAUER: You mean like the fact --

MS. MINTER: I don't want you to make

Page 19

Garcia

speeches about the other discovery. If you want to talk about speeches, you are just being out of control by insisting on turning the conversation back to defendants' discovery. We are not going to talk about that here. You are wasting time. I am going back to questioning the witness. If your point was to interrupt me, to get me sidetracked, if you do it again, I will call the judge. Don't you dare.

MR. ARONAUER: Don't hesitate to call the judge if you want.

MS. MINTER: You have been practicing long enough to pull those tricks.

MR. ARONAUER: Ms. Minter, at any point in time if you feel that I am acting inappropriately --

MS. MINTER: Yeah, you are making speeches.

MR. ARONAUER: Again, please don't interrupt me.

At any point in time if you feel that I am acting inappropriately, by all means, call Judge Pauley. Don't hesitate.

MS. MINTER: I would love to take pictures

Page 20

Garcia

of your client's expressions.

I am sorry. One of the things that I didn't get to say initially is that your lawyer requested that you have an interpreter for the deposition, and you cannot have independent conversations with the interpreter. She will interpret the question for you and she will interpret your answer. You cannot ask her things, you cannot talk to her separately.

Q. Do you understand that?

A. Yes.

Q. The first text just said come in Friday instead of Thursday, is that correct?

A. Yes.

Q. So what did you say back? What was your message back to Mr. Kandel?

A. To that message, I said that was fine.

Q. Who sent the next message?

A. The conversation ended there.

Q. The first text and your answer, that was it?

A. No, there were several messages.

Q. That's what I am asking. Perhaps you are not understanding. We will back up.

Page 21

Garcia

You described for me one text. Mr. Kandel said do not come in on Thursday, come in on Friday.

Was that the first text?

A. Yes.

Q. And you responded to that one "Fine"?

A. No, I didn't say that.

Q. We have to clarify your previous testimony.

What was your response to that first e-mail about coming in on a different day?

A. I asked why.

Q. And that's all you said in your response; one word?

A. I don't remember well.

Q. Did you need the Google translator for your answer?

A. A little.

Q. To interpret the word "fine" or the word "why"? You didn't know the word "why" in English?

A. I understand English but I don't know how to write.

Q. So you looked up or you had Google look up the word "why" in Spanish for you, is that true? Is that what you did?

Page 22

Garcia

A. Yes.

Q. You asked why.

So what was the next text you got from Mr. Kandel?

A. I don't remember exactly what he wrote.

Q. Which of the texts was the one that you say terminated your employment while you were in California? Which text was that?

A. Since the beginning, since he sent me that message saying that I shouldn't be there on Thursday.

Q. But he didn't say you were terminated, did he?

A. I was fired already.

Q. Were you fired before you left for California?

A. No.

Q. You said you were fired while you were in California. So I am trying to establish how is it you were terminated while you were in California? Please explain that to me.

A. Because he sent me that message that I shouldn't go on Thursday and they wanted to talk to me on Friday.

Q. And you interpreted that as telling you

Page 23

Garcia

that you were terminated?

A. Yes.

Q. Why?

A. For the messages he sent me later and he saying that I should go Friday, I shouldn't go Thursday.

Q. The messages he sent how much later?

A. I didn't count how many messages.

Q. In which message did he tell you you were terminated or fired or you no longer worked there? Tell me.

A. He didn't use that word in the message, but I was already fired.

Q. What word did he use that made you aware that you had been fired?

MR. ARONAUER: Objection.

MS. MINTER: He is being unresponsive to the question. I am going to get an answer from him. If you are objecting to the form of the question, move on.

Q. What word did he use in the text that made you think that you were being terminated?

A. The claims that he was making.

Q. I am sorry. Now I am confused.

Page 24

Garcia

The claims. He said that other employees complained about you?

A. Yes.

Q. Had there been any problems with any of your co-workers before you left for California, between you and your co-workers?

A. No.

Q. Had you been criticized for any of your conduct by Mr. Kandel or Mr. Guzman before you went to California?

A. I don't understand the question.

Q. Prior to going to California, had Mr. Kandel or Mr. Guzman complained to you about something about your work?

MR. ARONAUER: Objection.

A. No.

Q. But because of the change in schedule in the text, that was why you thought you had been terminated?

A. No.

Q. What was it that made you feel you were terminated? What did Mr. Kandel say about termination in those texts?

MR. ARONAUER: Objection.

Page 25

Garcia

Q. You started this by saying you were terminated while you were in California.

MS. MINTER: I am just trying to get your client to answer.

MR. ARONAUER: Objection.

MS. MINTER: He hasn't once given a responsive answer.

Q. Mr. Garcia, why did you testify that you were terminated while you were in California? What was the basis for that?

A. I already answered your question.

Q. Because you were told to come in on Friday instead of Thursday, that constituted termination?

MR. ARONAUER: Objection.

A. I am telling you through the messages he sent me, the claims that he said of things that I did, everything, all those things together, it means that I was already terminated while I was in California.

MR. ARONAUER: I ask to take a two-minute break. I want to talk to my client.

(Recess.)

MS. MINTER: Can we let the record reflect that Mr. Aronauer had asked for a break to

Page 26

Garcia

consult with his client.

Can we go back on the record now?

MR. ARONAUER: Yes.

MS. MINTER: Can you read the last question and answer back.

(Testimony read.)

Q. Before you left for California, did you think you were in some kind of trouble?

A. No.

Q. Before you left for California, did Mr. Kandel give you the Bad Horse Pizza American Express card?

A. I have it since before.

Q. Did he tell you to use it for any particular purpose in California?

A. Yes. He gave me authorization to spend $100, which I was allowed to take that, that he was giving me that, for whatever I wanted to buy. But I didn't use it.

Q. Did Mr. Kandel authorize you to take your family out to dinner while you were in California with the American Express card?

A. No.

Q. Did he authorize you to take friends or

Page 27

Garcia

traveling companions out to dinner with the American Express card?

A. No.

Q. Would it be simpler if from now on we use the initials BHP to refer to Bad Horse Pizza; would that be understandable to you?

A. As you wish. That's fine.

Q. Why did you have a BHP American Express card?

A. Because Mr. Kandel gave it to me for whatever -- anything we need for the restaurant.

Q. When was that?

A. I don't have the exact date when he give it to me.

Q. How about the year?

A. No, I don't remember.

Q. How long after you went to work at BHP did he give you the American Express card?

A. I don't remember how long.

Q. The first year you worked there?

A. No.

Q. Second year?

A. I don't remember what was the date. I don't.

Page 28

Garcia

Q. Did any other employees at BHP have an American Express card in the name of the restaurant?

A. No.

Q. Did Mr. Guzman have an American Express card?

A. Yes.

Q. So Mr. Guzman had.

A. Yes, I am sorry.

Q. Any other employees that you didn't mention in your previous answer?

MR. ARONAUER: I am going to object to the characterization that Mr. Guzman is an employee.

MS. MINTER: Well, that's a legal argument. You can save that one. We will get to that.

Q. What were you told you were supposed to use the card for?

A. For whatever the restaurant needed. Exclusively for the restaurant.

Q. What things did the restaurant need that you bought with the American Express card?

A. Vegetables, something that we bought at Costco's.

Q. What did you buy at Costco's?

Page 29

Garcia

A. Everything the restaurant needs. It's a long list.

Q. Did BHP have any suppliers that they ordered from?

A. Yes.

Q. What suppliers were those?

A. For salsas, flours.

Q. Do you mean flowers that grow or flours that are milled from grain?

A. Flour, the one we cook to create the pizza.

Q. What else did you have to buy?

A. The boxes for the pizzas, bags, bleaches, soap.

Q. But they didn't order vegetables from a produce supplier?

A. Vegetables also.

Q. Why were you given a card to buy anything the restaurant needed if they had suppliers bringing them?

A. They didn't buy everything through suppliers. There were a lot of little things that they needed to buy themselves.

Q. What, other than vegetables?

Page 30

Garcia

A. If we needed a light bulb, we bought that.
Q. Who gave you the card?
A. John Kandel.
Q. Did he give you any instructions when he gave you the card as to its use?
A. Yes. It was for the restaurant use. To buy whatever was needed while he was not there.
Q. Whatever the restaurant needed?
A. Yes.
Q. And only when Mr. Kandel was not there?
A. Well, when he was there, too, it was no problem, if we needed.
Q. If he was there, did he give you a specific instruction like, Antonio, go to Costco and buy light bulbs?
A. I would ask him.
Q. How did you know you needed to buy light bulbs?
A. Because they didn't turn on and we needed to change it. Something logical.
Q. Did Mr. Guzman give you any instructions about the use of the credit card?
A. No.
Q. Did you ever use the American Express card

Page 31

Garcia

for something that was a personal expense?
A. By mistake, yes, once.
Q. What was the mistake?
A. I bought a pizza at Domino's.
Q. You are laughing. That's funny?
A. Well, I was working at a pizzeria, so I went to buy...
Q. Was that on your break when you went to Domino's?
A. No.
Q. Were you working at the time you went to Domino's to order pizza?
A. No.
Q. Does Domino's accept American Express cards?
A. They accepted.
Q. How large was the order?
A. It was a small order. It was just for me.
Q. Do you have a personal American Express card?
A. No.
Q. And by mistake you took the BHP American Express card out of your wallet and gave it to the cashier?

Page 32

Garcia

MR. ARONAUER: Is that a question?
Q. How is that a mistake? How did you do that by mistake?
MR. ARONAUER: I am going to object to the form of the question.
Q. How was that a mistake? How did you do that?
A. I was drunk.
Q. What time of day was this?
A. Nighttime. Early hours.
Q. Early hours, like between 5:00 p.m. and 10 p.m.?
A. No.
Q. What time of day?
A. 1:00 or 2:00 a.m.
Q. Was anyone with you?
A. No, I was alone.
Q. I realize that your thinking may have been somewhat impaired at the time, but how did you pull an American Express card out of your wallet and think that it was yours?
MR. ARONAUER: I am going to object to the form of the question.
MS. MINTER: You can object to the

Page 33

Garcia

question.
Go ahead and answer. I am trying to understand the thought process here.
THE WITNESS: Can you repeat the question?
Q. Even though you were drunk, you went to pay for something. You pulled an American Express card out of your wallet.
What was the mistake?
MR. ARONAUER: Objection to the form of the question. At no point in time did my client state that he pulled the card out of his wallet. Don't make factual assertions, please.
Q. Where was the wallet --
MR. ARONAUER: Let me finish my objection.
MS. MINTER: I am satisfying your objection.
MR. ARONAUER: Every time I make an objection you interrupt me.
I object to the factual assertion that my client pulled out a card from his wallet. He never said that.
MS. MINTER: Fine. I will rephrase the question and that will make you happy.
Q. Where did you carry the American Express

Page 34

Garcia

card when you had it with you?

Do you think this is funny? This is a legal proceeding. I am not finding it funny, Mr. Garcia. Stop laughing.

MR. ARONAUER: I object to the characterization that my client is laughing.

MS. MINTER: Everyone in the room sees him laughing.

Q. Are you laughing, Mr. Garcia?

A. Well, your question is -- I think it's inappropriate.

Q. For me to ask you about using the company American Express card, that's inappropriate?

A. No. The question about where I was carrying the card.

Q. It belonged to your employer, Mr. Garcia. I want to understand how you went to Domino's and paid for a pizza with your employer's American Express card. Can you explain that to me?

A. I didn't go to Domino's.

Q. I am sorry. So how did you get the Domino's Pizza?

A. Online.

Q. You were home at the time?

Page 35

Garcia

A. Yes.

Q. And you filled in the numbers from the American Express card online?

A. Yes.

Q. What was the name on the American Express card?

A. My name.

Q. Your name was on the American Express card?

A. Yes.

Q. And it didn't say Bad Horse Pizza?

A. Yes, at the bottom it said both, my name and Bad Horse Pizza also.

Q. As you were entering the information to order the pizza online, did it occur to you that you were doing something improper?

A. No.

Q. Was the Domino's Pizza the only unauthorized charge you made with the American Express card?

A. Yes.

Q. Are you sure?

A. Yes.

Q. Did you ever buy any clothing at T.J. Maxx

Page 36

Garcia

with the American Express card?

A. No, I never bought clothes with that card. What I bought at T.J. Maxx were things for the restaurant.

Q. What were the things for the restaurant that you bought at T.J. Maxx?

A. A cutter for the pizza.

Q. A pizza cutter?

A. Yes, a pizza cutter. The ones to cut.

Q. Anything else?

A. The regular things that we bought there for the restaurant. A can opener.

Q. Did you report having used the American Express card for the Domino's Pizza?

A. Yes.

Q. Who did you tell?

A. Mr. Kandel was checking the statements daily, and I had the receipt also.

Q. So he asked you about it?

A. I would get there and give him the receipt if I bought something or he would ask me what did you buy at this place. So there was no problem.

Q. Did you come to him to tell him about the Domino's charge before he questioned you?

Page 37

Garcia

A. No. But that was the second day that I had the card.

Q. Does that refresh your recollection of when you got the card?

A. No.

Q. Do you still have the receipt from Domino's?

A. No.

Q. What did Mr. Kandel say about the charge of Domino's?

A. Well, he was upset.

Q. Why was he upset?

A. Because I used that card. It's his card.

Q. Was that the only reason he was upset?

A. Yes, because I used his card at another pizza place.

Q. So he mentioned that he was upset about that?

A. Yes.

Q. Are there other restaurants in your neighborhood that deliver food other than Domino's?

A. Well, now I don't live in the place that I used to live where I got the card.

Q. So I will rephrase this.

Page 38

Garcia

In the neighborhood near the place you were living when you used the card to buy the Domino's Pizza, did you have other food options that would deliver to your apartment at the time?

A. No.

Q. That was the only one that would deliver?

A. At that time, yes.

Q. What was your last date of employment at BHP?

A. I don't remember the day, but it was October 2014.

Q. How long after your return from California was it?

A. I don't understand.

Q. You don't understand what the last date of employment was at BHP?

A. I don't remember the date but it was October 2014.

Q. What was the date you started employment at BHP?

A. The year was 2011.

Q. What month was it?

A. I don't remember the month.

Q. Could it have been November?

Page 39

Garcia

A. No.

Q. You are sure it wasn't November?

A. No.

Q. Can you narrow it down to a month in 2011 when you started working there?

A. It was in the summertime.

Q. How do you know that?

A. Because it was warm. The weather was warm.

Q. Who were the people working at BHP in the summer of 2011?

A. Pasqual Basurto, Oscar. I don't remember the last name. Jose. I also don't remember his last name. From the waiters, Roberto DeLeon, Melissa. I don't remember the last name, and I don't remember the other ones.

Q. If they were asked, these people could testify that you were working at BHP in July and August of 2011?

A. Yes.

Q. Were there any papers or books or calendars in which you kept your work schedules in 2011?

A. No.

Page 40

Garcia

Q. You just remembered when you had to be somewhere?

A. About my job, yes, because they told me this would be your schedule.

Q. How did you hear about the job at BHP?

A. Through a friend.

Q. Who?

A. Erica Quintero.

Q. What was her job at BHP?

A. At the beginning, making deliveries.

Q. Did she later work there in another capacity?

A. Yes. After the delivery, she helped with the preparation of salads.

MR. ARONAUER: I would like to note for the record that Mr. Kandel instructed the translator to move my client's hand from his mouth. I have also noticed on more than one occasion that Mr. Kandel has made inappropriate laughs at my client's testimony. I am not going to tolerate Mr. Kandel interrupting or any action that will make it hard for my client to conduct his testimony. I know it's a contentious case, but I ask Mr. Kandel to

Page 41

Garcia

conduct himself professionally.

MS. MINTER: Are you finished making your speech?

Your client was laughing while I was asking him questions in his testimony. Why is that acceptable? He is in a lot more key role in this proceeding than Mr. Kandel is. I am asking him questions in his testimony and he is laughing at me. If you want to be the laugh police, stick to your own side of the table, Mr. Aronauer.

MR. ARONAUER: I have made my point.

MS. MINTER: What are you guys talking about?

THE INTERPRETER: I am translating what you are saying.

MS. MINTER: I forgot you are translating. I apologize. I didn't think of that. I haven't worked with a translator at a deposition before. This is a new experience. I just wasn't thinking and I really apologize.

THE INTERPRETER: I don't want you to think I am talking to him. I am not.

MS. MINTER: I didn't think about the

Page 42

Garcia

colloquy being translated.

Q. We were talking about Erica, the person who told you about the job, and I asked you what her job was at BHP.

You testified she was a delivery person, right?

A. No, I didn't say that.

MS. MINTER: Can you read back the part where I asked about Erica.

(Testimony read.)

Q. Then you went on to describe other jobs. Were these Erica's jobs you were talking about?

A. I don't understand. You confuse me.

Q. I asked you how you heard about the job, right? You got that part?

A. Yes.

Q. I asked you what Erica's job was at BHP and you testified delivery person.

A. She wasn't working there.

Q. I think you need to clarify that.

How did she know about the job?

A. Because she is a friend of Omar Guzman.

Q. Did she tell you what the job was that was available?

Page 43

Garcia

A. I don't remember if she told me or not.

Q. How did you apply for the job?

A. Well, after Erica Quintero told me, I went to talk to Mr. Guzman.

Q. Where?

A. Downstairs at the pizza.

Q. Downstairs at the pizza?

A. To the pizza place I went.

Q. Did you live above the pizza place?

A. No.

Q. Just wanted to be clear about that.

Tell me about your conversation with Mr. Guzman about the job?

A. Like every time you start a new job, I talked to him, I asked him what I needed to do, how much would be the salary, how many hours I have to work.

Q. Maybe I misunderstood you.

Did Erica tell you what the job was?

MS. MINTER: What are you looking at over there?

Let the record show that Mr. Aronauer is staring into my files on the table.

MR. ARONAUER: Let the record reflect that

Page 44

Garcia

I don't agree with Ms. Minter's characterization.

MS. MINTER: You are staring at my papers in my file very intently.

MR. ARONAUER: I don't agree with that characterization.

MS. MINTER: Then what are you looking at over here?

MR. ARONAUER: I am looking at you. You are doing the deposition.

MS. MINTER: No, you are looking down at the table peering around the documents. Really, everybody sees you doing that. You can object and make speeches but that's what you are doing.

MR. ARONAUER: I don't agree with that characterization.

MS. MINTER: Yeah, I know, like you would. I can't believe that. I have seen adversaries do that. I once came back from a break in a deposition or I think it was an arbitration and found the lawyer for the employers standing over the table where I was looking through my notes.

Q. Did Erica tell you what job was available?

A. Yes.

Page 45

Garcia

Q. What did she tell you?

A. That I should go see Omar.

Q. About what job?

A. That there was a job there.

Q. What job?

A. I don't remember if she told me that the job was to make deliveries or just to talk to him.

Q. So you went to see Omar.

Tell me about your conversation.

A. I went to see him. We talked about the schedule, we talked about the job, we talked about the salary.

Q. Did he tell you what the job was?

A. Yes.

Q. What did he say?

A. Making deliveries, and helping in the kitchen whatever was necessary.

Q. He told you deliveries and helping in the kitchen, that's what Mr. Guzman told you?

A. Yes.

Q. Did he tell you what the pay would be?

A. Yes.

Q. What did he tell you?

A. I don't remember the salary at the

Page 46

Garcia

beginning.

Q. Was there a time when you did remember what your starting salary was?

A. I think at the -- I'm not sure but I think at the beginning the salary was $8 per hour.

Q. Did you ask him for more money?

A. No.

Q. Did you have any experience working in a restaurant at the time you applied to BHP?

A. Yes, I have experience.

Q. What was your experience; what kind of work did you do?

A. I worked in a restaurant in the kitchen preparing food, as washer, making deliveries.

Q. Did Mr. Guzman ask you about your experience at all?

A. No.

Q. Where had you worked before coming to apply for the job at BHP?

A. I was working in Havana Central.

Q. Is that in New York?

A. Yes.

Q. Was that the only employer you had worked for in a restaurant?

Page 47

Garcia

A. No. It was a long list.

Q. How about we narrow it to New York.

How many restaurant employers have you had?

A. About five or six restaurants.

Q. Do you remember the names of any of them?

A. Yes. Professor Thom's.

Q. And others you can remember?

A. Cafe Con Leche.

Q. Any others?

A. I don't remember the name of the other ones.

Q. Were you working at the time you came to apply for a job at BHP?

A. Yes.

Q. Where were you working?

A. Havana Central.

Q. Was the job as a delivery man at BHP part-time or full-time?

A. Full-time.

Q. How many hours a week did you work at Havana Central?

A. Between 35 and 40 hours.

THE WITNESS: Can we take a break?

Page 48

Garcia

MS. MINTER: You want to take a break now?

THE WITNESS: Yes.

MS. MINTER: How long?

THE WITNESS: Two minutes.

(Recess.)

Q. I want to clarify something for the record. I asked you how many hours the job at Havana Central was at the time you went to work at BHP.

How many hours was that?

A. Between 35 and 40 hours I was working there.

Q. How many hours were you told that you would be working at BHP?

A. I don't remember if they told me how many hours.

Q. Were you planning to continue working at Havana Central when you started to work at BHP?

A. Yes, I continued working.

Q. What was your schedule at Havana Central?

A. I don't remember the schedule, but it was early.

Q. I am sorry, people have different definitions of "early."

What do you mean by "early"?

Page 49

Garcia

A. I began at 7:00 a.m. at Havana Central.

Q. You say you don't remember the hours you were told you would be working at BHP.

Was your schedule at BHP of importance to you?

A. Well, the thing was to balance the two jobs with the different schedules.

Q. Do you remember asking Mr. Guzman what your schedule at BHP would be?

A. Yes.

Q. And you don't remember what he told you?

A. I don't remember exactly.

Q. Do you remember approximately?

A. No.

Q. Would it be correct to say that the schedule would have been something you were thinking about at the interview given how you had to coordinate it with the job at Havana Central?

A. I had the schedule, I knew the schedule for Havana Central, but at Bad Horse, we didn't have a schedule. We would just talk about it.

Q. When was this discussion?

A. What are you referring to?

Q. Month, year.

Page 50

Garcia

A. Well, the year, it was 2011 when I started working for them.

Q. That's good. Can we narrow it down to a month?

A. No, I don't remember the month. I only remember that it was during the summertime.

Q. So the interview was in the summer as well?

A. Yes. When I began working, yes.

Q. Did you tell Mr. Santos that you got a new job?

A. At that time I wasn't living with Mr. Santos.

Q. Was he a friend at the time?

A. Yes, we were friends.

Q. In the course of being friends as opposed to being roommates, did you also talk about important personal things with him?

A. Yes, we talked, but not as close that we talk now about things.

Q. Did you tell anyone you knew outside of BHP that you got a job there?

A. No. The only one that knew was Erica Quintero.

Page 51

Garcia

Q. Did you tell Mr. Guzman that you had another job at the time?

A. I don't understand.

Q. When you interviewed with Mr. Guzman about the job at BHP, did you tell him that you had a job at Havana Central? It's pretty clear.

A. Oh, yes, he knew that I was working for Havana Central.

Q. How did he know that?

A. During the interview that we had, he asked me if I have another job.

Q. Did he express any concern about how that job would mix with your job at BHP?

A. No.

Q. Between the interview with Mr. Guzman and your start date, how much time elapsed between the interview and the day you started working for BHP?

A. I started working the same day.

Q. Is there any document somewhere which might refresh your recollection of what date it was that you started to work at BHP?

A. No.

Q. At the time you filed this lawsuit, did you remember when your start date was?

Page 52

Garcia

A. Date, no. The year, yes.

Q. How did you remember the month? Was there some point of reference that reminded you?

A. No. The only thing I remember is it was summertime.

Q. It was summertime or it was warm? I just want to clarify your answer.

A. Summertime.

Q. July or August?

A. I cannot say what month if I am not sure what month was it.

Q. You testified that you continued to work at Havana Central after you went to work at BHP, correct?

A. Yes.

Q. For how long did you continue at Havana Central past the date on which you started BHP?

A. A couple of months more.

Q. Do you remember approximately the date?

A. No.

Q. Why did you leave Havana Central?

A. Because I had an argument with one of the managers. Not really an argument, but something that we disagreed. We couldn't agree on something.

Page 53

Garcia

Q. Did you leave voluntarily or involuntarily?

A. Voluntarily. Because I already had a job.

Q. You didn't leave involuntarily?

A. No.

Q. You said because I had another job. Were you referring to the job at BHP?

A. Yes.

Q. So you quit Havana Central because you had BHP?

A. Yes.

Q. Did you look for another job to replace the earnings you were making at Havana Central?

A. No.

Q. Did you do anything else to make up for the earnings you lost when you left Havana Central?

A. No.

Q. As I understand it, you quit Havana Central because you had an argument with a manager?

A. Yes. We couldn't agree on the things that we were doing.

Q. When you got the job at BHP, did you tell the people at Havana Central that you were working there?

Page 54

Garcia

A. No.
Q. Why not?
A. Because it was personal.
Q. You don't remember the month you left Havana Central?
A. No.
Q. Did you have to adjust your schedule at Havana Central in any way once you took the job at BHP?
A. No.
Q. When you actually started at BHP, how many hours were you working a week?
A. About 40 hours.
Q. Just to clarify and make sure that I am correct, you were working about 40 hours at BHP and about 35 to 40 hours a week at Havana Central?
A. Yes.
Q. Did you ever state or write that you were working 65 hours a week at BHP when you went to work there in 2011?
A. That was after when I was making pizza.
Q. When did you stop being a delivery man for BHP?
A. I make deliveries for about seven or eight

Page 55

Garcia

months.

MS. MINTER: Are you prepared to stipulate that he ceased being a delivery person in June of 2012, since it's in the Complaint?

MR. ARONAUER: I am not prepared to have this type of discussion on the record. I don't think it's appropriate for a deposition.

MS. MINTER: I can't imagine why not since we often have stipulations, but I will just ask the witness then if that would be easier. It certainly won't be shorter. You wrote it in the Complaint that he stopped being a delivery man in June of 2012.

MR. ARONAUER: Ms. Minter, again, for the second time, I don't feel comfortable having this type of stipulation on the record.

MS. MINTER: Why?

MR. ARONAUER: Because I don't want to.

MS. MINTER: Oh, well, that's different. But there's no official --

MR. ARONAUER: Are you willing to discuss the fact that you didn't comply with the stipulation --

MS. MINTER: Oh, will you just stop? You

Page 56

Garcia

are like a broken record. I asked you to make a stipulation about the witness' testimony.

Can you note the point where Mr. Aronauer refused to stipulate the date that the witness stopped being a delivery man, so we will just ask him, and we will ask it in a way that you are not going to like any better.

MR. ARONAUER: Is that a threat?

MS. MINTER: No, I am just telling you that we are gong to have to go through a whole area that's not going to be very pleasant. I think you should stipulate.

Can we mark this as Exhibit 1 to the plaintiff's deposition.

MR. ARONAUER: Ms. Minter, in all fairness --

MS. MINTER: I don't want to hear another speech.

MR. ARONAUER: Ms. Minter, you are engaging in conversation with me. I am allowed to respond. Every time I make a response, you immediately begin to interrupt me.

MS. MINTER: Because you are making speeches about discovery.

Page 57

Garcia

MR. ARONAUER: I am not making speeches about discovery. I am asking the opportunity to respond. You are not allowing me to respond. Every time I start talking you interrupt me. It's very, very difficult.

MS. MINTER: Are you going to say something different this time?

MR. ARONAUER: I don't feel comfortable stipulating on the record. Anything you want to stipulate to before or after the deposition, I am happy to have a conversation with you.

MS. MINTER: This is ridiculous. I have never heard somebody saying they are not comfortable stipulating to a date on the record rather than me take the time to pull it out of the witness. This is nuts.

MR. ARONAUER: You know, what I recall was that we had an agreement that you were going to go over the records, and you decided you don't want to comply with it.

MS. MINTER: I am not going to let you make speeches. You whined and complained about someone else making speeches, and here you are. Let's not have it.

Page 58

Garcia

MR. ARONAUER: No speeches here.

MS. MINTER: Are you taping the deposition?

MR. ARONAUER: I am not taping the deposition.

MS. MINTER: Well, you are holding something. It looks --

MR. ARONAUER: Like everybody else in this room I have a cell phone.

Are any of your clients taping the deposition?

MS. MINTER: How do I know?

MR. ARONAUER: Would you want to ask them?

MS. MINTER: Not on the record and not because you asked.

MR. ARONAUER: Let's go off the record, please.

MS. MINTER: We are not going off the record. I am going to try to elicit the date.

MR. ARONAUER: No. I want to know if this deposition is being taped. I have a right to know that.

MS. MINTER: I am just going to ignore you.

Page 59

Garcia

MR. ARONAUER: Then we are leaving.

MS. MINTER: I am not going off the record. Don't pull your client out of the deposition. If you walk out there will be sanctions.

MR. ARONAUER: First of all, that's up to the judge, not you.

MS. MINTER: Yeah, well, anybody who walks out of a deposition...

MR. ARONAUER: Ms. Minter, is this deposition being taped?

MS. MINTER: Not as far as I know.

MR. ARONAUER: Ask your clients.

MS. MINTER: Not in front of you I wouldn't.

MR. ARONAUER: May I ask your clients?

MS. MINTER: No, you most certainly cannot. You can't talk to my clients.

Why are you laughing?

MR. ARONAUER: Because he showed me his cell phone to show that it's not being taped.

MS. MINTER: This is annoying. You are obstructing the deposition. I asked you to stipulate to a date, and now you made me spend

Page 60

Garcia

20 minutes getting it out of your witness.

MR. ARONAUER: Is this deposition being taped?

MS. MINTER: Not as far as I know. That's all I can tell you. I would never instruct the client to tape a deposition.

You looked like that's what you were doing, so I asked you. Nobody else is doing anything that looks like they are taping.

I figured there was going to be a lot of interruptions today.

Here, Plaintiff's Exhibit 1 to the deposition. Mark this, please.

(Garcia Exhibit 1, document titled "Amended Complaint", marked for identification, as of this date.)

Q. Mr. Garcia, I am showing you a document which we have marked as Exhibit 1 to the Garcia deposition.

Have you seen this document before?

A. Yes.

Q. What is it?

A. This is our case. This is the lawsuit. It's about our case. It's the papers that we

Page 61

Garcia

prepared.

Q. Did you review the documents that your lawyer has filed to begin your lawsuit before they were filed in federal court? I am not asking about the conversation. I am just asking if you reviewed it.

A. Yes.

Q. Did you have it read to you in Spanish or were you given a written translation of the Complaint?

A. It was in Spanish.

Q. It was written in Spanish, the copy you looked at?

A. Yes, it was written.

Q. Before it was filed, you were satisfied that the facts in the document were correct?

A. Yes.

Q. Can you look at page 3 of the document which says "Amended Complaint" but they forgot to say "Second Amended," so it's really Second Amended Complaint.

MR. ARONAUER: Ms. Minter, I think my client previously testified about his ability to read in English.

Page 62

Garcia

MS. MINTER: The translator is going to interpret. I didn't expect him to read the entire document.

Look at page 5, paragraph 26. I would quarrel with the characterization as a "promotion," but for the purposes of the facts can I ask the interpreter to read paragraph 26 to the witness in Spanish, please.

(Interpreter translated the paragraph.)

Q. Does that refresh your recollection as to the month and year on which you ceased to be a delivery man at BHP?

A. Yes.

Q. So you ceased to be a delivery man in June of 2012, is that correct?

A. Correct.

MS. MINTER: While we have the Complaint in front of us, can you look at page 3 of the Second Amended Complaint, paragraph 11, and if I can ask the interpreter to read that to the witness in Spanish.

(Interpreter translated the paragraph.)

A. What are you referring to that?

Q. The first sentence, you say that

Page 63

Garcia

"Defendant Guzman is and was at all times relevant hereto a minority owner of the restaurant and exercised control of the day-to-day operations of the restaurant."

MR. ARONAUER: Objection. I am going to --

MS. MINTER: I haven't asked a question yet. You are not objecting to anything. I was about to ask a question.

MR. ARONAUER: Fair enough. You are right.

Q. What was the basis for your making that statement in paragraph 11?

MR. ARONAUER: I am going to object.

MS. MINTER: Do you have any grounds? I am not asking him about the communications with counsel. He said he read this, he was satisfied it was factually accurate, and I am asking him about the facts that he put into paragraph 11 or you put on his behalf in paragraph 11. I'm not asking him about privilege. If you think there's a privileged matter, you are free to interpose an objection. I have no intention of inquiring into attorney-client privileged

Page 64

Garcia

communications.

MR. ARONAUER: Are you done?

MS. MINTER: I don't know. Let me think about it for a minute. Go ahead.

MR. ARONAUER: I am instructing my client not to answer on the grounds that there's a legal analysis here with respect to the FLSA and New York Labor Law. My client is a layman. I'm instructing him not to answer the question.

MS. MINTER: First of all, there are tons of cases that say that's not a valid objection but I didn't ask him about the second sentence, Mr. Aronauer. I asked him about the first sentence. That is not a legal conclusion. The second sentence is a legal conclusion. The first sentence is factual.

Are you still instructing him not to answer?

MR. ARONAUER: You are only asking him about the first sentence?

MS. MINTER: That's what I am asking him about, yes. I didn't say anything about the second sentence.

I mean, I disagree with your argument and

Page 65

Garcia

I think you are wrong on the law, but I don't care because I'm not asking him about it.

MR. ARONAUER: I object to the characterization that he wrote it, which I think was how you phrased the question, but he can answer the question.

MS. MINTER: He said that he satisfied himself that the facts were correct.

Q. We are going back to the first sentence of paragraph 11, Mr. Garcia.

On what did you base the facts on the first sentence that Mr. Guzman is a minority owner of the restaurant and that he had control of the day-to-day operations of the restaurant?

A. What basis? Me?

Q. You read this over and satisfied yourself that the facts were accurate.

So why is the first sentence of paragraph 11 accurate?

A. I don't understand what it says there. I don't understand.

Q. Do you know what the term "owner" means?

A. Yes.

Q. What is an owner?

Page 66

Garcia

A. Well, the owner, the owner of a business.

Q. Do you understand the distinction between a majority owner and minority owner?

A. Yes, but it's still being an owner.

Q. On what are you basing your statement that Mr. Guzman is an owner of the restaurant?

A. Because he told me in the several conversations that we had.

Q. When did those conversations take place?

A. While we were at the restaurant, when we went out to have some beers. We had a lot of conversations.

Q. How soon after you went to work at BHP did you start to discuss ownership interests with Mr. Guzman?

A. Since I started working there I knew who the owners were.

Q. How did you know that?

A. Because he told me. Mr. Guzman would talk about it. And we knew each other for years before that.

Q. So prior to going to work there, Mr. Guzman told you that he was an owner of BHP?

A. Yes.

Page 67

Garcia

Q. Did you believe him?

A. Well, yes.

Q. He wasn't maybe just bragging to make himself look more important?

MR. ARONAUER: Objection.

Q. You can answer.

A. No. I believe him.

Q. Was anyone else present when you had conversations about ownership with Mr. Guzman?

A. While we were at the restaurant all the other employees listened to our conversation.

Q. Was this on one occasion or more than one occasion?

A. Multiple occasions.

Q. Was this a formal conversation or an informal conversation?

A. A normal conversation.

Q. Did one of these conversations take place when Mr. Kandel was absent from the restaurant for an extended time?

A. Yes.

Q. Do you recall when that was?

A. About the conversations that I had with him?

Page 68

Garcia

Q. I am talking about this particular conversation that happened when Mr. Kandel was absent for a period of time.

A. Well, Mr. Kandel, several times he was absent. On several occasions he was absent.

Q. Did Mr. Guzman call a meeting of the employees during a period when Mr. Kandel was absent from the restaurant for an extended period of time?

A. No.

Q. You don't remember that?

A. No.

THE WITNESS: I need to go to the bathroom.

MS. MINTER: Absolutely.

(Recess.)

Q. Mr. Garcia, dealing with the period up to June of 2012 when you were no longer a delivery man, you said, I believe, that you worked as a delivery man for seven or eight months, correct?

A. More or less, yes.

Q. Did you have a set schedule as a delivery man?

A. Yes, but it wasn't written.

Q. How did you know what your schedule was if

Page 69

Garcia

it wasn't written?

A. We had talked about it at the beginning.

Q. Well, would it be fair to say that as a delivery man, you would have to be working during the hours the restaurant was open?

A. No. We entered at 3:00 to make the preparations that we needed to.

Q. I am not talking about preparation, I am talking about delivery. You were a delivery man.

A. It's the same. It was the same job. It was delivery, making deliveries, and preparing.

Q. And it's your testimony that prior to June of 2012 you were preparing?

A. Since I began working there.

Q. Tell me what you define as preparing.

A. To prepare is to make salads, to cut the dough for the pizza.

Q. That's it?

A. To clean the refrigerator, to maintain everything in order.

Q. What does "maintain everything in order" mean?

A. To clean the refrigerators, to place things. That everything would be fine.

Page 70

Garcia

Q. Before June of 2012, did anyone else clean the refrigerator other than you?
A. Yes. The people making deliveries, we would take turns. One would clean one day and the other one another time, and like that.
Q. Who were the other people cleaning the refrigerator along with you prior to June of 2012? We are talking prior to June of 2012 now.
A. Pasqual.
Q. Pasqual cleaned the refrigerator?
A. He was the other delivery man.
Q. What was your schedule before June of 2012; what were the hours that you worked?
MR. ARONAUER: Let me be clear. Are you saying before --
MS. MINTER: June 2012.
MR. ARONAUER: Let me finish. Just to be clear, are we saying before he was assigned to work only in the kitchen when you say "before 2012"?
MS. MINTER: That's your phraseology. I am talking about the time which he said that he was the delivery man.
MR. ARONAUER: I am going to ask now for

Page 71

Garcia

the third time just to clarify, when you say "before 2012," do you mean the time period before he was assigned to work solely in the kitchen or you just mean the date?
MS. MINTER: You can't phrase my questions the way you want them. I am talking about the period when he was employed by BHP prior to June of 2012. That's my question. You can't ask me to change my question the way you want it.
MR. ARONAUER: I am not asking you to change your question, I am asking you to be more specific so my client understands it.
MS. MINTER: You are sending clues to him. You are interrupting to give him hints.
Q. Do you understand the question, Mr. Garcia?
A. At the moment, yes, and some other moments I get confused with the dates.
MS. MINTER: You are supposed to state if you get confused, not only when your lawyer hints that you should say you don't understand.
THE WITNESS: Okay.
Q. The questions I am asking right now until I tell you otherwise are dealing with your employment

Page 72

Garcia

at BHP prior to June of 2012.
Is that clear?
A. Okay.
Q. What was your schedule prior to June of 2012?
A. From 3:00 until we close.
Q. Was that the same schedule every week until June of 2012?
A. No. Thursday, Fridays and Saturdays from 3:00 to 11:00.
Q. What about the other days?
A. From 3:00 to 10:00.
Q. Is that because the restaurant closed earlier on those days? Did the restaurant have different hours on different days?
A. Yes. Weekdays they would close an hour earlier. So Thursday, Fridays and Saturdays we would close an hour later.
Q. Is that why your shift ended earlier on some days than others, because of the restaurant's hours?
A. Yes.
Q. Is it fair to say that other than that change in hours and the days at the restaurant, that

Page 73

Garcia

you had the same set schedule every week prior to June of 2012?
A. No, it varied. That's why I cannot give you the exact amount of hours I was working because it varied.
Q. Prior to June of 2012, you are saying that each week you worked a different schedule? I'm not talking about the difference between Thursday and Wednesday, I am talking about from week-to-week did you have the same schedule?
A. The schedule was set but it depends how the business was going. If it was very busy, we would stay later.
Q. And this was prior to June 2012?
A. That was before. We are talking about that, June --
Q. Yes. Before June 2012, you are saying your schedule changed every week?
A. Yes.
Q. What were some of the schedules you were working prior to June 2012?
A. What I am referring to is that it's like we didn't finish exactly at 11 p.m. That was the time that varied. We would finish 11:15, 11:20,