FBCPGARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ANTONIO BAUTISTA GARCIA,

4                  Plaintiff,

5           v.                          14 CV 8858 (WHP)

6   BAD HORSE PIZZA, INC., JOHN
    KANDEL, and OMAR GUZMAN,
7
                Defendants.
8
    ------------------------------x
9                                      New York, N.Y.
                                       November 12, 2015
10                                     10:37 a.m.

11  Before:

12                 HON. WILLIAM H. PAULEY III,

13                                     District Judge

14                          APPEARANCES

15  THE LAW OFFICES OF JACOB ARONAUER
         Attorney for Plaintiff
16  BY:  JACOB ARONAUER

17  CARY KANE, LLP
         Attorney for Plaintiff
18  BY:  JOSHUA SAMUEL CARLO PARKHURST

19  THE LAW OFFICE OF RACHEL J. MINTER
         Attorney for Defendants
20  BY:  RACHEL J. MINTER

21

22  ALSO PRESENT:  Ms. Sian Ricketts, paralegal with Mr. Aronauer

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

FBCPGARC

```
 1              (In open court)

 2              THE COURT:  Good morning.  Please be seated.

 3              (Case called).

 4              MR. PARKHURST:  Yes, for the plaintiff, Antonio

 5    Garcia, Joshua Parkhurst of the Law Offices of Joshua

 6    Parkhurst.

 7              MR. ARONAUER:  Your Honor, Jacob Aronauer from The Law

 8    Offices of Jason Aronauer, and my paralegal, Sian Ricketts, to

 9    my right, is also present.

10              THE COURT:  All right.  Good morning.

11              MS. MINTER:  Well, in light of what I've just been

12    handed, I'm not sure.  I'm Rachel Minter.  I have been counsel

13    for the defendants.

14              THE COURT:  No, you are counsel, Ms. Minter.

15              MR. KANDEL:  John Kandel, owner Bad Horse Pizza.

16              THE DEPUTY CLERK:  Thank you.

17              THE COURT:  All right.  Good morning.  First of all,

18    Mr. Parkhurst, you've got to update ECF.  Are you affiliated

19    with the law firm of Cary Kane?

20              MR. PARKHURST:  I was, your Honor, and I did provide

21    notices of changes of address and firm in all of my cases; so I

22    do not know why Cary Kane still appears there.

23              THE COURT:  Well, it still appears.  Please take some

24    action with the clerk's office, and is your e-mail at the Giles

25    Law Firm, LLC?
```

FBCPGARC

1          MR. PARKHURST:  I do have two e-mails.  There's my

2   own, Joshua Parkhurst, or JParkhurst@ParkhurstLawFirm.com, and

3   I am of counsel to another firm, and that is an active

4   relationship.  So I have both e-mails as contact information on

5   ECF, but I am of counsel to the Giles Law Firm.

6          THE COURT:  Well, your appearance in this case should

7   reflect what you just stated on the record, namely, that you're

8   Parkhurst LLP, or whatever it is, right?

9          MR. PARKHURST:  Yes.

10          THE COURT:  Okay.  So change that too.

11          MR. PARKHURST:  I will.  Okay.

12          THE COURT:  And why does Mr. Garcia need two different

13   law firms representing him in this FLSA case, Mr. Aronauer?

14          MR. ARONAUER:  Your Honor, with all due respect to

15   Ms. Minter, obviously, as you can tell in this case, it was

16   fairly acrimonious.  I thought it would be beneficial to my

17   client to have a more senior attorney working with me on this

18   case.  It was a decision I made.  I would receive --

19          THE COURT:  Okay.  Were you both at the deposition?

20          MR. ARONAUER:  No.  Due to a religious holiday,

21   Mr. Parkhurst was not at the deposition.

22          THE COURT:  All right.  First of all, who wants to

23   tell me what's going on in this case?

24          MR. PARKHURST:  With respect to the last

25   correspondence, I wrote that; so I will, your Honor.  We were

prepared to take Mr. Kandel's deposition on September 17th.
The night before, we were notified that he was terminating
Ms. Minter's representation and would need time to procure new
representation.

Since then, Ms. Minter has requested a withdrawal of
representation.  Mr. Kandel has repeatedly e-mailed us,
repeatedly e-mailed Mr. Aronauer, really, saying I'm ready to
show up for my deposition, can we go.

The only problem is the withdrawal of Ms. Minter has
not been approved by the Court, and as I mentioned in my
letter, the other issue is that there are two other defendants,
one is a corporate defendant, which I don't believe can appear
pro se, and then there's the other individual defendant.  And
we're not sure what the status is with his representation.

So basically, your Honor, we are prepared to go
forward with the deposition, but as an ethical matter, we don't
want to be in a situation where we're deposing somebody who is
technically represented by counsel, but is insisting that he's
pro se, and the same thing with Mr. Guzman.  And then there's
the question of the corporate defendant.

So that's why I wrote this letter; so we could get the
issue of representation clarified so we can take this
deposition and complete discovery.

MS. MINTER:  May I be heard, your Honor?

THE COURT:  Yes, now it's your turn, Ms. Minter, and I

1    want to hear from you.

2              MS. MINTER:  First of all, as to the matter that

3    Mr. Parkhurst raised about the corporate representation, I was

4    well aware of that, and I sent an e-mail four or five months

5    ago to Mr. Kandel.  Now, the problem is he did not send me a

6    copy the letter that he sent to the Court.  I was provided it

7    subsequently by Mr. Aronauer.  So there were a lot of e-mails

8    that I would have liked to have retrieved.

9              THE COURT:  I don't know what you're referring to.

10             MS. MINTER:  I got an e-mail from Mr. Aronauer

11   forwarding an e-mail he was sent by Mr. Kandel saying:  See you

12   Thursday, Jacob.  I sent this letter to the Judge.  And then he

13   produced the text of the letter that he had sent you on

14   October 14th that I had never seen.

15             My only point is I advised him in an e-mail months ago

16   that he could not represent the corporate defendant or the

17   other individual defendant, Mr. Guzman, and I did not get a

18   response to that, as with many things.  So this is not a

19   surprise to Mr. Kandel --

20             THE COURT:  When did you first learn that you were

21   having "irreconcilable differences" with Mr. Kandel?

22             MS. MINTER:  Right after the deposition of Mr. Garcia

23   on September 30th -- actually, during the deposition of

24   Mr. Garcia on September 30th.

25             THE COURT:  And what was it about that deposition that

FBCPGARC

1    led you to believe that the differences are irreconcilable.

2                MS. MINTER:  Well, Mr. Aronauer, first of all, stood

3    up, on the record, in front of everybody, and told Mr. Aronauer

4    that he agreed with him, that I was wrong in something,

5    colloquy about -- well, and when I tried to take him off to

6    have a private discussion, he started ranting at me that I

7    didn't ask this question, I didn't ask this question, I was

8    supposed to ask this question, I was doing a terrible job, and

9    he paid me all this money, and I was a terrible lawyer.  And I

10   thought that that pretty much seemed to indicate because --

11               THE COURT:  How much money did Mr. Kandel pay you,

12   Ms. Minter?

13               MS. MINTER:  He's a defendant, your Honor.  He's been

14   paying me for my hourly services since last December.

15               THE COURT:  Would you answer my question?

16               MS. MINTER:  I don't know.

17               THE COURT:  Well, he says he's paid $80,000 to you.

18               MS. MINTER:  I have every one of the invoices with me.

19               THE COURT:  Fine.  So why don't you take a look at

20   them for a moment and tell me exactly how much money he's paid

21   you.

22               MS. MINTER:  Your Honor, why is my performance as

23   counsel at issue here?  I would really like to know, and if

24   that's an issue here, I'd like more time to prepare for that.

25               THE COURT:  Ms. Minter, your conduct in this

FBCPGAR2

1    litigation has been an issue virtually from the beginning.

2         MS. MINTER:  And Mr. Aronauer's conduct has not?  All

3    these acrimonious exchanges --

4         THE COURT:  Would you answer my question?

5         MS. MINTER:  -- are only one-sided, right?

6         THE COURT:  Would you answer the Court's question?

7         MS. MINTER:  I have copies for everybody else, if

8    you'd like them.

9         THE COURT:  What are you muttering?  I can't hear you.

10   There's a microphone there.  Don't mutter.  If you're

11   addressing the Court, I want to be able to hear what you're

12   saying.

13        MS. MINTER:  I don't have a calculator with me, your

14   Honor; so it's going to take me a few minutes to do this.

15        THE COURT:  Well, I tell you what, I have another

16   matter on for oral argument; so we will take a recess.  You can

17   go out into the witness room and make your calculations so that

18   you can answer the Court's question.  We'll resume when I

19   complete the oral argument and the matter that's on for 11:00.

20        (Recess)

21        (In open court)

22        THE COURT:  All right.  Please be seated.  All right.

23   Ms. Minter, do you have an answer to the Court's question?

24        MS. MINTER:  Your Honor, your law clerk just very

25   kindly gave me a calculator, since I'm still manually working

FBCPGAR2

1    my way through.  However, there are three things related to

2    this that I would like to tell the Court.

3          THE COURT:  First, Ms. Minter, you've had a 40-minute

4    recess while I heard oral argument in another matter.  My

5    question is a simple one.  Can you approximate for me the

6    amount of legal fees that you have received from defendants?

7          MS. MINTER:  Your Honor, I'm manually adding these.  I

8    have not billed Mr. Kandel since September 17th.  I was not

9    charging him ever since then.  This goes back to December of

10   last year.  If you'd like to look, these are my scratch notes.

11   I'm making --

12         THE COURT:  I'm not interested.

13         MS. MINTER:  Well, I'm doing what you asked me to do.

14         THE COURT:  I am not interested in looking at your

15   scratch notes, and I'm not going to permit you to yell at me or

16   to interrupt me.

17         MS. MINTER:  I apologize, your Honor.

18         THE COURT:  Would you please answer my question.  Can

19   you approximate for me the amount of money that you have

20   received from the defendants in connection with your

21   representation of them in this matter?

22         MS. MINTER:  You're not going to let me state two

23   things beforehand.

24         THE COURT:  I would like an answer to that question.

25         MS. MINTER:  I haven't finished adding it, your Honor.

FBCPGAR2

1    I can't estimate it.  All I have -- I've been working on it.

2    The reason I said I would show you this, is I just haven't been

3    sitting there.  I have been sitting there trying to add up the

4    numbers manually so I could report them back to you.  If I had

5    a calculator, I would have had them by now.  I can only tell

6    you an -- and I'm afraid of telling you the wrong figure.  It's

7    not $80,000, that I can tell you clearly.

8           THE COURT:  Approximate for me the amount of money

9    that you've received, that's all I'm asking.

10          MS. MINTER:  Can I answer one other thing?

11          THE COURT:  No.

12          MS. MINTER:  $50,000, your Honor.

13          THE COURT:  How much?

14          MS. MINTER:  50.  Your Honor, I have invoices here

15   that itemize it in one-sixth of an hour.  Mr. Kandel never

16   complained about the invoices until after the Garcia

17   deposition.  Every six minutes I spend are on every invoice.

18   They are itemized, and it's never been an issue until now.

19          We had a settlement agreement in April that I was very

20   behind.  I begged him to settle.  He put a number out that was

21   accepted by plaintiffs, and he reneged on it.  And his response

22   was:  I'd rather give the money to you than to Antonio, the

23   plaintiff.

24          I had no interest financially in getting him to

25   settle, and this was what was best for him.  And he decided not

FBCPGAR2

1    to settle, and he's probably come to regret that decision, but

2    I wasn't doing it because I'm using him as some kind of hash

3    pit.  Yeah, I am angry because that's an outrageous thing to

4    say to me.

5              THE COURT:  Are you done?

6              MS. MINTER:  Yes.

7              THE COURT:  Good.  Sit down.

8              Mr. Kandel, what do you have to say about this matter?

9    How much have you paid Ms. Minter?

10             MR. KANDEL:  I stopped really keeping track.  I would

11   have to say 75, 80, in that ballpark.  You know, 65, 70, 75.  I

12   really don't keep that good records.

13             THE COURT:  Did you write her checks or did you give

14   her cash?

15             MR. KANDEL:  Checks, checks.

16             MS. MINTER:  Gosh.

17             THE COURT:  What was that, Ms. Minter?

18             MS. MINTER:  I'm really appalled by the image you seem

19   to have gotten about what kind of attorney-client relationship

20   this was vis-a-vis money.  I don't take payments in cash.

21   That's really offensive.

22             THE COURT:  Once again, Ms. Minter, I'm going to ask

23   you to speak into the microphone so that I and the court

24   reporter can hear you when you're muttering something.

25             MS. MINTER:  I'm so sorry, your Honor.

FBCPGAR2

1          THE COURT:  I really, somehow, think that you don't

2     mean that when you say that to the Court.

3          MS. MINTER:  I would like a chance to be fairly heard,

4     your Honor, and I don't feel that that's happening.

5          THE COURT:  I just gave you a chance, and you said you

6     had nothing else to say.  So then I asked you to sit down so

7     that I could hear from Mr. Kandel about this matter.

8          Now, Mr. Kandel, in your view, has the attorney-client

9     relationship with Ms. Minter broken down, or are you able to

10    work with her?

11         MR. KANDEL:  No, no more.

12         THE COURT:  When did you come to the conclusion that

13    you could not work with Ms. Minter?

14         MR. KANDEL:  Well, this is my first experience with a

15    legal matter, and I guess over the course of the year, I have

16    been upset from time to time with their back and forth, who's

17    smarter, who's better, who's more whatever lawyer things you

18    guys do, which I guess she says I'm not paying for, but I'm

19    sure somewhere in there I'm paying for.

20         But I guess I'm going with it because I don't know

21    what else to do.  Hence, my letter from a few days ago, and I

22    have no more money to give to the proceeding; so I didn't know

23    what I expected to come from keeping it ongoing.  Had there

24    been a lower number initially, before I gave it over here, this

25    would probably be done.

FBCPGAR2

1          THE COURT:  When you say "gave it over here," what do

2     you mean?

3          MR. KANDEL:  Well, paid it to the lawyer.  Had the

4     other side come with a reasonable number, as opposed to a

5     quarter million dollars, I'd probably be done, maybe 40,000 or

6     50,000 before I gave the money, but I have a small business.

7     You see, I don't make much.  So I can work with her, but -- I

8     mean I can't really work with her.  I don't particularly like

9     her.  I think, as you can see, there's -- I don't know.  This

10    is -- I don't know.  This is not my world, you know.  So

11    that's, you know, a lot to say.

12         MS. MINTER:  May I respond to this, please, as a

13    factual issue?

14         THE COURT:  Ms. Minter, when I'm done, I'll give you a

15    chance to respond.

16         MS. MINTER:  Okay.  I will await it eagerly.  Thank

17    you.

18         THE COURT:  Once again, I don't think you really mean

19    that when you say that.

20         MS. MINTER:  No, the last thing I said I truly meant,

21    your Honor.

22         THE COURT:  Oh, that's the exception that proves the

23    rule, then, in this conference.

24         Mr. Kandel --

25         MR. KANDEL:  I mean, I don't know if it's possible,

FBCPGAR2

1      but if I have access to a computer for a second, I can print up

2      all the images of the checks that have been put towards the

3      case from me personally or from my mother's account or from my

4      pizza store account, which are definitely more than 50.  I

5      mean, the first check alone was 25.  That was a year ago.

6              THE COURT:  Do you understand that if I relieve

7      Ms. Minter as your counsel, that your corporation is going to

8      have to retain counsel?

9              MR. KANDEL:  The corporation is virtually close to not

10     existing anymore; so, you know, I don't know what to say about

11     that.  I'm not about to become homeless because of this case;

12     so....

13             THE COURT:  Well, the case is going to continue

14     against you individually, in any event.

15             MR. KANDEL:  I know.

16             THE COURT:  And if the corporation is not represented

17     by an attorney, the plaintiffs would be entitled to move for a

18     judgment against the corporation.  Then what are you going to

19     do?

20             MR. KANDEL:  Walk dogs, I guess.

21             THE COURT:  Would you be willing to go back to the

22     magistrate judge and see if you couldn't resolve this case with

23     the plaintiffs and Ms. Minter?

24             MR. KANDEL:  I'd love to resolve it, but I -- for one,

25     you know where I stand on the morals or the facts behind the

FBCPGAR2

1    case; so I have a problem with that.  And I guess I'm a citizen

2    of the United States.  I have a right to, I guess, a trial and

3    a jury.  Although, I guess I can't really afford it now, and I

4    guess I really never could.  I wish I thought about it a year

5    ago.  But they want too much money.  I don't have it, and like

6    I said, I'm not going to be on the streets because of Antonio

7    Garcia.

8         THE COURT:  All right.  But in your letter to the

9    Court, you've essentially acknowledged at least some liability.

10        MR. KANDEL:  Well, yes, I did say I, you know, didn't

11   pay him overtime, but 65 hours a week for three-and-a-half

12   years is, you know, a complete lie.  As you can also see from

13   the letter, unless I just give people, you know, three times as

14   much money over three years for making pizzas, which, you know,

15   defeats his back to 65 hours, plus the hours of the store.

16        I mean, you read the letter, and yes, I didn't pay him

17   overtime, but the money that we agreed on to pay him for the

18   hour was for the large amount of hours.  So, you know, had I

19   known, he would have made less money, if I paid him correctly

20   and kept him at a regular wage or minimum wage.  So he made

21   more money and, you know, it was just an error on my part.

22        And if the Court wants to stick me with the bill, you

23   know, then there's nothing I can do about it now; so....  If he

24   deserves the money, you know, then he deserves the money.  You

25   know, if you find he deserves it, you know, which I don't know

FBCPGAR2

```
1    how you can find that from reading the letter --
2              THE COURT:  Well, ultimately, a jury is going to have
3    to determine that.
4              MR. KANDEL:  Well, I think they'd probably come to the
5    same conclusion.
6              THE COURT:  Do you want to try to resolve this case?
7              MR. KANDEL:  I'd love to try to, but unless they want
8    to take Bad Horse Pizza credit for the next five years until my
9    lease is over, then I don't know what else I can do.
10             THE COURT:  All right.  Ms. Minter?
11             MS. MINTER:  It is one very serious fact that I just
12   need to correct about this.  While it's true that they wanted
13   about $200,000 at the very beginning of the case, back in
14   December of 2014, we had a settlement, an agreed-upon
15   settlement that Mr. Kandel offered $60,000, I believe, in
16   either May or April.  He agreed to it, and I would like at
17   least plaintiff's counsel to at least acknowledge that that is
18   a fact, instead of just -- we had an agreement.
19             Mr. Kandel decided to renege on the agreement.
20   There's a whole flurry of e-mails and letters.  They were quite
21   understandably very, very angry about this.  So nobody is
22   looking for a quarter million dollars.  The $60,000 should have
23   gone to the plaintiff, and I would never have taken another
24   dime from this case.
25             Mr. Kandel said:  I'd rather pay it to you than to
```

FBCPGAR2

1   Antonio.  I have constrained my privilege from telling you a

2   number of other things about the corporate defendants, unless

3   by putting my fees and my competence at issue here, there is

4   now a waiver of issue, and I will inform the Court of his plans

5   for the corporation.  I'm asking.

6          THE COURT:  You're daring me.

7          MS. MINTER:  I'm not.

8          THE COURT:  I'm you're daring me.

9          MS. MINTER:  I'm asking for a ruling.  It is not meant

10   to be disingenuous.

11          THE COURT:  I'm going to require you to submit a

12   letter to me, ex parte, under seal, with a copy to Mr. Kandel

13   with your bills because I'm very interested to know what you've

14   done in this case other than obstruct the case and write

15   numerous letters to me to the point that I had to direct you

16   and Mr. Aronauer to cease writing letters to me.

17          MS. MINTER:  Your Honor, those were initiated by

18   Mr. Aronauer.  Every one of my letters was in reply to a letter

19   he filed.  I did not initiate any of them.  You have this idée

20   fixe that I am the instigator of this.  I can't get past that.

21   They were from Mr. Aronauer.  Everything was a reply to

22   Mr. Aronauer until my request to be relieved.  If you look

23   through the docket sheet, they're responses to letter motions

24   from Mr. Aronauer.  I did not start those fights.

25          THE COURT:  Am I correct that only a single deposition

FBCPGAR2

1     has been conducted in this case?

2                 MS. MINTER:  Yes.  Well, we thought we had a

3     settlement in spring.  That's why we had asked you for

4     additional time because we had to -- they had accepted a

5     settlement offer.  We thought the case was done.  Could you

6     please ask them to confirm that?

7                 THE COURT:  Do you have a copy of the deposition

8     transcript?

9                 MS. MINTER:  I do, yes.  I wanted to give it to

10    Mr. Kandel.  He has not asked me for it, or come to get it or

11    anything.  Of course.  The reporting service delivered it to me

12    because I was the lawyer whose name was on the order for the

13    transcript.

14                THE COURT:  Right, but you didn't pay the court

15    reporter, right?  You had --

16                MS. MINTER:  No.  Under the terms of the retainer

17    agreement, which I will be happy to provide your Honor with --

18                THE COURT:  I want the retainer agreement.  I want

19    your bills and --

20                MS. MINTER:  You're not accusing me of anything, of

21    course.

22                THE COURT:  -- you can submit all of that to me

23    ex parte.

24                MS. MINTER:  And the implications of that request --

25                THE COURT:  There's no implication because I'm

FBCPGAR2

 1   confronted with a lawyer who, after 40 minutes, can't even

 2   effectively approximate the fees that --

 3           MS. MINTER:  If I had had --

 4           THE COURT:  -- she's charged in this matter when she

 5   perfectly well understands that that's part of the issue with

 6   Mr. Kandel.

 7           MS. MINTER:  It has not been an issue up until

 8   September, your Honor.  He never questioned these detailed

 9   invoices.  I did not come prepared to defend myself here.  I

10   didn't know that it was --

11           THE COURT:  You are the one seeking to withdraw.

12           MS. MINTER:  Because of the differences.  He wouldn't

13   agree to the settlement.  He said, oh, no, no.

14           THE COURT:  That was back in April.  Why didn't you

15   withdraw in April?

16           MS. MINTER:  I did.  I told him I was going to and

17   he --

18           THE COURT:  No.

19           MS. MINTER:  He talked me into staying, your Honor,

20   and he advised the Court of that, as you may recall.

21           THE COURT:  Sounds like he kept sending you a steady

22   stream of payments.

23           MS. MINTER:  Ha, I'm sure that my parents, good union

24   organizers as they were, are rolling in their graves at this

25   kind of accusation.  I'm not a money grubber.  I don't do this

FBCPGAR2

1    for the money.  He's the only defendant I've represented in a

2    case like this, and I will never, ever do it again.

3              THE COURT:  Please sit down and control yourself.

4              MS. MINTER:  Why.

5              THE COURT:  Now, Mr. Aronauer, what do you have to

6    say?

7              MR. ARONAUER:  Your Honor, I actually had a phone call

8    with Ms. Minter, I think it was earlier this week or last week,

9    and, you know, as I said to her, not to be overdramatic,

10   whatever the outcome of this case is there are, obviously,

11   going to be no -- there are no winners.  I do have a

12   suggestion, in the hopes of resolving this case.

13             THE COURT:  What's your suggestion?

14             MR. ARONAUER:  I think, with all due respect, it might

15   be better discussed in chambers but, obviously, in light of the

16   situation, I can understand you prefer to have it on the

17   record.  I'll make it on the record, your Honor.

18             I think that going before a magistrate is an excellent

19   idea.  I also think that I have a problem because I have a

20   client, and the client thought that we had a number -- I mean,

21   it's in the open now -- for $60,000.  Both myself,

22   Mr. Parkhurst and Ms. Ricketts have done work subsequent to

23   this agreement.  So, you know, that puts me in a bind, but

24   ultimately, you know, I'm an agent, but it is very hard for me

25   to tell my client to take less than 60 when he thought in the

FBCPGAR2

spring there was an agreement for 60.

Now, I'm willing to have parallel tracks.  I'm willing to go before a magistrate under the following conditions, which I think, in light of the history of this case, is fair.  First, if we are going to be going before a magistrate for settlement discussions and an agreement is reached at the conclusion of that mediation session, an agreement will be reached on the record, not a memorandum of understanding, everything, to use the cliche, soup to nuts.  Because I don't want to hear a week later that there's going to be fighting over the language of the agreement.  That's the first condition.

The second condition is that I've heard either Mr. Kandel doesn't have money, then I hear the money is coming from his mother, then I hear the money is coming from his brother.  If, in the event that there is a source of any settlement funds that are to come that would result in a settlement, I want that person or persons there at the mediation.  I think that's fair.

The third thing is I do think, whether it's Ms. Minter or somebody else, I do want him represented by an attorney at that mediation.

I can tell you the fourth thing I would just like to add is that I am -- I understand -- well, I wouldn't say Mr. Kandel is as innocent as he makes himself out to be.  I do respect the fact that it's a small business.  I do understand

FBCPGAR2

1    that payouts sometimes are necessary to facilitate a settlement

2    agreement, and that's something that I would recommend to my

3    client, even if it's more than a year because I'd like to get

4    this done, like everybody here.

5            Also, I'm not the judge.  I'm not trying to overstep

6    my bounds, but I think, in light of the history of this case, I

7    think those are fair parameters to ask for a mediation session.

8    But with that being said, I want to get depositions lined up.

9    I want them to comply with the joint agreement that we had, and

10   I think that that's my approach in terms of going forward, your

11   Honor.

12           THE COURT:  From your perspective, what occurred at

13   the deposition?  Do you have a copy of the transcript?

14           MR. ARONAUER:  I do, your Honor.

15           THE COURT:  I'd like to be provided with a copy of the

16   transcript.

17           MR. ARONAUER:  I will provide it today, your Honor.

18           THE COURT:  What happened at the deposition?

19           MR. ARONAUER:  I mean, Ms. Minter asked my client

20   questions, some of which were related to the facts of this

21   case.  It was a very acrimonious deposition.  I thought there

22   were times, frequent times where Miss Minter attempted to get

23   into my client's Social Security status or immigration status.

24           There was a time where she physically went around the

25   table and grabbed my chair, which Ms. Ricketts can confirm.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FBCPGAR2

1    thought there were many questions about whether or not -- that

2    just simply did not go to the merits of the case, that it was

3    an attack on my client to have the audacity to file this

4    lawsuit.

5            I would say a very small percentage of the questions

6    asked by Ms. Minter went to the heart of the issue of this

7    case, which is whether or not a violation of the FLSA occurred.

8    I did not file this lawsuit as an unlawful termination.  I'd

9    like to add, both Ms. Ricketts and Mr. Kandel can confirm this,

10   she took a dig at my client's sexuality.

11           MS. MINTER:  That's not true.  It isn't true.

12           THE COURT:  Control.

13           MS. MINTER:  It is on the record and I --

14           THE COURT:  Sit down and control yourself.

15           MS. MINTER:  People just sit here.  Where is it on the

16   record?

17           THE COURT:  Sit down and control yourself.

18           MR. ARONAUER:  And, your Honor, if you want to contact

19   the stenographer and if you want to contact the translator as

20   to that issue, by all means.

21           THE COURT:  Has your client seen Mr. Kandel's letter

22   to the Court?

23           MR. ARONAUER:  No, your Honor.

24           THE COURT:  Show it to him.  Send me a copy of that

25   transcript.  You can be seated.

FBCPGAR2

1              Mr. Kandel, are you going to get an attorney?

2              MR. KANDEL:  If they want to work for free, then no.

3              THE COURT:  Then I'm not letting Ms. Minter out of the

4    case.  I'm sending you to the magistrate judge for another

5    settlement conference.

6              MS. MINTER:  Now, you got what you wanted, indentured

7    servitude.  I get to represent you without pay.

8              THE COURT:  Stop muttering.  That's correct.

9              MS. MINTER:  And you know what, your Honor --

10             MR. KANDEL:  I'll try --

11             MS. MINTER:  I have a family to support, and I do not

12   take this very lightly.  The only --

13             THE COURT:  Fine.  Now --

14             MS. MINTER:  The thing is what I said to Mr. Aronauer

15   at the deposition, which is in the transcript, is -- nothing of

16   what you're saying is in the transcript.  You can jump up and

17   down on the table in your underwear and it wouldn't be

18   reflected in the transcript; so this is a great opportunity for

19   everyone to say I did things at the deposition that are not on

20   the record.  I could have done that too.

21             THE COURT:  By November 19th, one week from today,

22   Ms. Minter, you will submit to the Court, under seal, a letter

23   with your retainer agreement, and all of the bills that you

24   have submitted on the case to your client, and a record of all

25   the payments that you've received from your client.  That will

FBCPGAR2

 1    be submitted under seal, ex parte, with a copy only to your

 2    client, Mr. Kandel.

 3              MS. MINTER:  I'm happy to do that.

 4              THE COURT:  With respect, I'm going to issue an order

 5    of reference, and I'm going to fix dates for depositions in the

 6    case.

 7              MS. MINTER:  Your Honor, after receiving the materials

 8    that you want me to send, are you then going to reconsider the

 9    motion to have me withdraw, if you get documentation of

10    irreconcilable differences?  They're not about money, your

11    Honor.

12              THE COURT:  Ms. Minter, I'm not exactly sure what I'm

13    going to do, other than I'm not relieving you as counsel for

14    the corporate defendant in this case.  So take a deposition.

15              MR. ARONAUER:  Your Honor, the deposition transcript,

16    do you want under seal or --

17              THE COURT:  No, submit the deposition transcript to

18    me, and there's nothing in it that should be subject to seal,

19    is there?

20              MR. ARONAUER:  No, I don't believe so, your Honor.

21    Just clarifying.

22              THE COURT:  All right.  Submit the transcript to me.

23              MS. MINTER:  Your Honor, one last thing, and then I'll

24    get out of your hair.  Mr. Kandel has planned all along that

25    the corporate defendant would be bankrupt, and so you need to

FBCPGAR2

1    be aware of that going forward.  That's what's going to happen,

2    and why he didn't care if there was an attorney assigned to the

3    corporate defendant.

4              THE COURT:  We'll see whether that happens, but I'm

5    going to direct the deposition of Bad Horse Pizza, taken in the

6    next two weeks.

7              MR. ARONAUER:  Absolutely.

8              THE COURT:  That's all.

9              MR. ARONAUER:  Absolutely, your Honor.

10             THE COURT:  I'll look forward to receiving these

11   submissions.

12             (Off the record)

13             THE COURT:  I just want to make certain that the

14   record is perfectly clear here, in light of Ms. Minter's last

15   comment.  Ms. Minter, let me remind you that you are the

16   attorney for each of the defendants in this case, including Bad

17   Horse Pizza.  You're under an ethical obligation not to discuss

18   privileged material and disclose it without the consent of your

19   client, something which you just did in this courtroom.

20             MS. MINTER:  Your Honor, the case was --

21             THE COURT:  You are representing them, all three

22   defendants.  I'm not relieving you --

23             MS. MINTER:  Yes, I know.

24             THE COURT:  -- at this time.

25             MS. MINTER:  I got it.  He got what he wanted.  He got

FBCPGAR2

1    a free lawyer.

2              THE COURT:  So get to work on the case.

3              (Adjourned)