UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| ANTONIO BAUTISTA GARCIA, | : |
| Plaintiff, | : |
| -against- | :    14cv8858 |
|  | :    OPINION & ORDER |
| BAD HORSE PIZZA, INC. and JOHN KANDEL, | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Antonio Bautista Garcia brings this action against Defendants Bad Horse Pizza, Inc. and its owner John Kandel for unpaid overtime under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") and failure to provide wage notices and wage statements under NYLL. Following a one-day bench trial, this Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## BACKGROUND

        Between April 1, 2011 and February 29, 2016, Kandel owned and operated Bad Horse, a Manhattan pizzeria that grossed more than $500,000 in revenue each year. (Trial Transcript dated July 14, 2016 ("Tr."), at 4, 5, 31, 37.) It operated from 5:00 p.m. to 10:00 p.m. Sunday through Wednesday and from 5:00 p.m. to 11:00 p.m. Thursday through Saturday. (Tr. at 46.) Kandel had the authority to hire and fire employees and set their work schedules. (Tr. at 5.)

        Kandel's management style could be characterized as informal. He described his staff "as a little family," regularly had after-work beers with them and did not require employees

1

to punch a time clock. (Tr. at 8, 11, 28.) At trial, he could not verify the actual numbers of hours any employee worked. (Tr. at 11, 24–25, 27, 42.) If kitchen staff came in late, he "never took it off their pay" because, in his words, "those guys worked really hard." (Tr. at 33.) While Bad Horse used ADP to process payroll, Kandel employed a practice of reporting only the first 40 hours of work and paid any overtime in cash off-the-books. (See Tr. at 15; Plaintiff's Proposed Findings of Fact and Conclusions of Law, ECF No. 102, at ¶ 33.)

Garcia began working six days per week at Bad Horse in June 2012.[1] (Tr. at 11, 55.) Kandel initially employed him as a deliveryman at a rate of $9 per hour. (Tr. at 39.) During his first month of employment, he regularly arrived twenty minutes late, but thereafter, quit his other job so that he could begin work at 3:00 p.m. (Tr. at 37–38.) In addition to deliveries, Garcia performed some prep work and helped clean up at the end of the day, causing his shift to end approximately fifteen minutes after the restaurant closed. (Tr. at 29.) With this schedule, Garcia worked approximately 45 hours per week for 7–8 months. (Tr. at 38–39.)

In February 2013, Garcia began working in the kitchen and Kandel increased his hourly wage to $12. (Tr. at 40, 76.) For the next 9 months, he continued to work approximately 45 hours per week. (Tr. at 11, 44.)

In November 2013, Kandel asked Garcia to work longer hours and take on additional work in the kitchen. (Tr. at 44.) Kandel increased his hourly wage to $12.69.[2] (Tr. at 15, 45.) Over the next 5 months, Garcia worked approximately 55 hours per week. (Tr. at 40.)

---

[1]   After discussing this timeline with Plaintiff's counsel during a brief recess, Garcia claimed he began working at Bad Horse a full year earlier, in June 2011. (Tr. at 63–64.) However, this Court finds that testimony not credible. Moreover, such a claim is inconsistent with Garcia's testimony that he delivered pizzas for only 7–8 months before transitioning to work in the kitchen in February 2013. (Tr. at 38, 55.)

[2]   While Kandel asserts that he raised Garcia's pay in May 2013, he also testified that he paid Garcia only $10 per hour during Garcia's first year in the kitchen. (Tr. at 13–15.) But that is inconsistent with other evidence in the case.

2

In April 2014, Kandel again asked Garcia to work additional hours as a dough maker. (Tr. at 15.) Kandel increased Garcia's hourly pay to $14. (Tr. at 45.) Over the next 6 months, until his termination in October 2014, Garcia worked approximately 65 hours per week. (Tr. at 5, 15, 37, 45.)

During the course of Garcia's employment, Kandel provided him with additional financial benefits. Beginning at the end of 2012, Kandel paid Garcia's cell phone bill amounting to approximately $120 per month for six months. (Tr. at 14, 82–83.) At some point in 2013, Kandel started paying Garcia regular weekly bonuses ranging between $50 and $100 in cash. (Tr. at 13, 75.)

It is uncontroverted that Kandel displayed a labor law poster in Bad Horse, stating, among other things, that employees are entitled to overtime at time and a half after working 40 hours. (Tr. at 32.) It is also undisputed that Kandel did not pay Garcia time and a half for work performed after 40 hours. (Tr. at 16–17.) And Garcia never received a wage notice during his employment at Bad Horse. (Tr. at 32.)

## DISCUSSION

A. Threshold Issues

Bad Horse is subject to the FLSA's wage-and-hour provision because it was "an enterprise engaged in commerce" and, at all relevant times, its annual gross volume of sales and business exceeded $500,000. See 29 U.S.C. §§ 203(s)(1), 207(a)(1). This Court has subject matter jurisdiction over Garcia's FLSA claims pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Garcia's NYLL claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy. Venue is proper pursuant to 28 U.S.C. § 1391 because Bad Horse is a New York corporation located within the Southern District of New York.

B. <u>Statute of Limitations</u>

FLSA claims have a two-year statute of limitations, unless the violation was willful, which extends the limitations period to three years. 29 U.S.C. § 255(a). "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." <u>Young v. Cooper Cameron Corp.</u>, 586 F.3d 201, 207 (2d Cir. 2009) (internal quotation marks omitted). "To show that an employer acted with reckless disregard, a plaintiff must only show that the employer knew or had reason to know that it was or might have been subject to the FLSA. . . . Neither an employer's good-faith but incorrect assumption regarding its FLSA obligations, nor an employer's lack of reasonable basis for believing that it was complying with the FLSA, is by itself sufficient to demonstrate an employer's willfulness." <u>Padilla v. Sheldon Rabin, M.D., P.C.</u>, 176 F. Supp. 3d 290, 299–300 (E.D.N.Y. 2016) (internal citation and quotation marks omitted).

While some evidence supports the conclusion that Kandel willfully violated FLSA's overtime requirements—Kandel himself received overtime pay when he worked at an aviation maintenance facility; Kandel displayed a labor law poster at Bad Horse; and Kandel reported no more than 40 hours each week to ADP—other evidence suggests that Kandel's violations were not willful. (Tr. at 15, 20, 32.) Each time he asked Garcia to take on additional hours, he gave him a wage increase. (<u>See</u> Tr. at 11, 15, 44.) Kandel argues that it would make little economic sense for an employer to circumvent FLSA by increasing wages when it might have been cheaper to simply pay time and a half. (Tr. at 32–33.) Additionally, when Garcia began taking on extra hours, he regularly received cash bonuses, in addition to his regular salary, at the end of each week. (Tr. at 13, 75.) Further, the evidence suggests that Garcia never raised the issue of overtime pay with Kandel prior to the filing of this law suit. (Tr. at 84.) After this

lawsuit was filed, Kandel changed Bad Horse's wage practices to comply with FLSA. (Tr. at 16.) Hearing and observing Kandel on the witness stand, this Court finds his testimony credible and sincere. Accordingly, this Court finds that Kandel's violations of the FLSA were not willful.

Unlike FLSA, NYLL claims are subject to a six-year statute of limitations. N.Y. Lab. Law § 198(3). This limitations period does not shorten for non-willful violations. Thus, notwithstanding FLSA, Garcia may recover overtime compensation extending to the beginning of his employment.

   C. Overtime Pay

Under both the FLSA and NYLL, employees who work more than forty hours per week must be compensated for overtime work at a rate of one and a half times their standard rate. Tapia v. Blch 3rd Ave. LLC, No. 14-CV-8529 (AJN), 2016 WL 4581341, at *5 (S.D.N.Y. Sept. 1, 2016); 29 U.S.C. § 207(a); 12 NYCRR § 146-1.4. "Plaintiffs bear the burden of demonstrating the number of hours that they worked." Tapia, 2016 WL 4581341, at *5 (quoting Kim v. Kum Gang, Inc., No. 12-CV-6344 (MHD), 2015 WL 2222438, at *25 (S.D.N.Y. Mar. 19, 2015)). But, if an employer fails to keep detailed and accurate records:

> Plaintiffs need only produce evidence sufficient to determine hours worked "as a matter of just and reasonable inference." The burden then shifts to the employer to produce evidence "of the precise amount of work performed or . . . evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Plaintiffs' recollections are sufficient to . . . shift the burden to the employer.

Tapia, 2016 WL 4581341, at *5 (quoting Kuebel v. Black & Decker Inc., 643 F.3d 352, 362 (2d Cir. 2011)).

Throughout the entirety of his employment, Garcia worked more than 40 hours per week, but never received overtime pay. (See Tr. at 16–17.) Therefore, Garcia is entitled to overtime damages in the amount of his unpaid overtime premiums.

5

From June 2012 through January 2013, Garcia worked approximately 45 hours per week at a rate of $9 per hour. Unpaid overtime for this period amounts to $787.5.

From February 2013 through October 2013, Garcia worked approximately 45 hours per week at a rate of $12 per hour. Unpaid overtime for this period amounts to $1,170.

From November 2013 through March 2014, Garcia worked approximately 55 hours per week at a rate of $12.69. Unpaid overtime for this period amounts to $1,998.68.

From April 2014 to his termination in October 2014, Garcia worked approximately 65 hours per week at a rate of $14 per hour. Unpaid overtime for this period amounts to $4,550.

In sum, Garcia is entitled to $8,506.18 in unpaid overtime during his employment at Bad Horse.

Further, "lump sum payments that are regularly made in the same amounts" and "do not fluctuate based on the number of overtime hours an employee worked . . . cannot qualify as overtime payments." Therefore, the $8,506.18 to which Garcia is entitled may not be reduced because of the monthly cell phone bills paid by Bad Horse (Tr. at 14) or the weekly $50–$100 bonuses paid by Kandel (Tr. at 75).

  D.  Liquidated Damages

FLSA and NYLL both provide for liquidated damages equal to overtime recovered. See 29 U.S.C. § 216(b); N.Y. Lab. Law §§ 198(1-a), 663(1). However, "if the employer shows to the satisfaction of the Court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA or NYLL], the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260; see N.Y. Lab. Law § 198(1-a) ("[T]he court shall allow

6

such employee to recover . . . , unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages.").[3]  "To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.'"  Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 150 (2d Cir. 2008).

Although Garcia failed to demonstrate that Kandel willfully violated FLSA, Kandel failed to produce any evidence that he took steps to learn the requirements of FLSA and comply with them.[4]  See McLean v. Garage Mgmt. Corp., No. 09-CV-9325 DLC, 2012 WL 1358739, at *12 (S.D.N.Y. Apr. 19, 2012) ("While GMC has not shown it acted in good faith in failing to pay Garage Managers overtime wages, the plaintiffs have also not shown that GMC's violation of law was willful.").  Accordingly, Garcia is entitled to liquidated damages.

Garcia argues that he is entitled to simultaneously recover liquidated damages under both FLSA and NYLL, essentially resulting in treble damages.  There is no appellate authority on the issue and courts are divided.  See Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) (Buchwald, J.).  Some courts have permitted double recovery of liquidated damages, reasoning that liquidated damages under FLSA and the NYLL serve different purposes: the FLSA liquidated damages are compensatory while the NYLL liquidated damages are punitive.  Tapia v. Blch 3rd Ave. LLC, No. 14-CV-8529 (AJN), 2016 WL 4581341, at *7 (S.D.N.Y. Sept. 1, 2016).  However,

---

[3]   "The statutory text of the liquidated damages provisions of the present NYLL is not identical to that of the FLSA.  However, courts have not substantively distinguished the federal standard from the current state standard of good faith."  Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) (citation omitted).

[4]   There is an ongoing circuit split as to whether a finding of willfulness precludes a finding of good faith.  See Emily Nolan Litzinger, Willfulness, Good Faith, and the Fair Labor Standards Act, 12 Nev. L.J. 112 (2011).  However, this case presents the exact opposition scenario: an employer who did not willfully violate the FLSA, but who still failed to prove that his actions were in good faith.

>this argument was premised on an older version of the NYLL liquidated damages provision, which required that the employer's failure to comply with the statute be "willful," and provided for liquidated damages on only 25% of the recovered wages. In 2009, the willfulness requirement was changed to match the FLSA's good faith requirement, and on April 9, 2011, the 25% provision was changed to match the FLSA's 100% recovery. Without opining on the appropriate rule for earlier time periods, th[is] Court determines that there is no plausible distinction between the two liquidated damages provisions after April 9, 2011. Th[is] Court therefore joins those other courts that have held that liquidated damages under the FLSA and NYLL for periods after April 9, 2011, do not stack.

Tapia, 2016 WL 4581341, at *7 (citations omitted); Inclan, 95 F. Supp. 3d at 506. Therefore, Garcia is entitled to recover $8,506.18 in liquidated damages.

E. Wage Notices and Statements

During the relevant period, employers were required to provide employees with notices informing them of, inter alia, their rate of pay at the time of hiring and on the first of February in each subsequent year. N.Y. Lab. Law § 195(1) (Apr. 9, 2011). Statutory damages of $50 per workweek, with a maximum of $2,500, were available for violations during the relevant time period. N.Y. Lab. Law § 198(1-b) (Apr. 9, 2011). Employers were also required to provide employees with a wage statement with each payment of wages. N.Y. Lab. Law § 195(3). Statutory damages of $100 per workweek, with a maximum of $2,500, were available for violations during the relevant time period. N.Y. Lab. Law § 198(1-b) (Apr. 9, 2011).

Because Garcia never received wage notices or statements (see Tr. at 32), he is entitled to the statutory damages of $5,000 in total for violations of NYLL § 195(1), (3).

F. Attorneys' Fees

Both FLSA and NYLL allow for an award of "reasonable" attorneys' fees to a prevailing party. See 29 U.S.C. § 216(b); N.Y. Lab. Law § 663(1). Having determined that Plaintiff established liability for violations of FLSA and NYLL, this Court concludes that Plaintiff is entitled to a reasonable award of attorneys' fees and costs.

In determining reasonableness, Courts employ the "presumptively reasonable fee" standard, which "boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Simmons v. N.Y. City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted).  To calculate the presumptively reasonable fee, "courts typically start with a determination of the lodestar amount, which is 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'"  Exp. Dev. Canada v. Bonilla, No. 13-CV-4952 (KBF), 2014 WL 713470, at *4 (S.D.N.Y. Feb. 19, 2014) (quoting Healey v. Leavitt, 458 F.3d 63, 71 (2d Cir. 2007).

Courts "assess[] the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits."  Anthony v. Franklin First Fin., Ltd., 844 F. Supp. 2d 504, 507 (S.D.N.Y. 2012).  "To determine the prevailing market rate, '[t]he rates used by the court should be current rather than historic hourly rates.'"  Anthony, 844 F. Supp. 2d at 507 (quoting Reiter v. MTA N.Y. City Transit Auth., 457 F.3d 224, 232 (2d Cir. 2006)).  "Additionally, courts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted."  Anthony, 844 F. Supp. 2d at 507 (citations and internal quotation marks omitted).  The Second Circuit also instructs that judges should consider:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

9

Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections, 522 F.3d 182, 184 (2d Cir. 2008).

In addition to determining the reasonableness of the hourly rates, courts must also ensure the reasonableness of the hours billed. Courts consider the "contemporaneous time records . . . that specify, for each attorney, the date, hours expended, and nature of the work done, and its own familiarity with the case . . . and its experience generally." Mugavero v. Arms Acres, Inc., No. 03-CV-5724 (PGG), 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (citation and internal quotation marks omitted). "Courts base the hours inquiry not on what appears necessary in hindsight, but on whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Mugavero, 2010 WL 451045, at *6 (citation and internal quotation marks omitted).

Courts "should exclude from this initial fee calculation hours that were not reasonably expended." Hensley, 461 U.S. at 434 (internal quotation marks omitted). "To that end, '[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" Ognibene v. Parkes, No. 08-CV-1335 (LTS), 2014 WL 3610947, at *3 (S.D.N.Y. July 22, 2014) (quoting Hensley, 461 U.S. at 434). "[A]cross-the-board reduction[s are] appropriate where the records demonstrate excessive communication with co-counsel." De La Paz v. Rubin & Rothman, LLC, No. 11-CV-9625 (ER), 2013 WL 6184425, at *4 (S.D.N.Y. Nov. 25, 2013). And "courts have reduced or even disallowed requested attorneys' fees where the supporting time records were not broken out with sufficient detail to enable it to determine the reasonableness of the time spent on particular tasks." Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic, No. 10-CV-5256 (DF), 2012 WL 5816878, at *10 (S.D.N.Y. Nov. 14, 2012).

10

Moreover, "travel time by counsel should be compensated at half-rate, in accordance with established court custom." Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 139 (2d Cir. 2008).

Here, Garcia was represented by the Law Offices of Jacob Aronauer and the Law Offices of Joshua Parkhurst. Aronauer requests a billing rate of $250 per hour for his time, $175 per hour for David Schaffer, a law clerk awaiting bar admission, and $75 per hour for each of the three paralegals employed on this case, and Parkhurst seeks a rate of $400 per hour. (Aronauer Decl., at ¶ 25.) Courts in this circuit have previously determined that rates of $400 per hour for partners and $250 per hour for associates are reasonable in FLSA cases. See Boutros v. JTC Painting & Decorating Corp., No. 12-CV-7576 (PAE), 2014 WL 3925281, at *7 (S.D.N.Y. Aug. 8, 2014) (finding Parkhurst's rate of $400 per hour reasonable). The rates sought by Plaintiff's counsel are reasonable.

Aronauer billed 183.29 hours of attorney time and 28.9 hours of non-attorney time and Parkhurst billed 71.1 hours of attorney time. (Aronauer Decl., at ¶ 25.) Plaintiff's counsel employed an across-the-board, twenty-percent reduction of their request. (Aronauer Decl., at ¶ 11.) With that reduction, Garcia seeks $61,249.80 in attorneys' fees. (Aronauer Decl., at ¶ 11.)

This Court recognizes the difficulties Plaintiff's counsel faced in prosecuting this action. Defense counsel resisted Plaintiff's reasonable discovery requests and launched a barrage of acrimonious letters and emails to her adversary and this Court. (See, e.g., ECF No. 46, at 4.) Kandel's counsel vexatiously multiplied the proceedings in this case and then sought leave to withdraw when Kandel could no longer pay her fees. (See Nov. 12, 2015 Hearing Transcript, ECF No. 61, at 9.) Suffice it to say that Plaintiff's counsel faced many challenges.

In the end, this Court commends Plaintiff's counsel for their perseverance in seeing what should have been a mine-run case through to trial and completion.

Nevertheless, Plaintiff's application for counsel's fees warrants some further reduction. This Court notes that Plaintiff's counsel's decision to unilaterally reduce their fees by 20% was prudent. There were a number of time entries that do not qualify as attorney time. (See, e.g., Aronauer Decl., at 23 (billing for 1.6 hours to create a summons and civil cover sheet and then "walk to SDNY Courthouse").) There are also multiple vague entries and block billing.

There were no novel issues of law or fact. Indeed, Kandel submitted a letter to this Court acknowledging that he violated FLSA and NYLL. (See Letter from Kandel dated March 22, 2016, ECF No. 70. ("I recognize that I broke the law.").)

This Court finds that a modest further reduction in Plaintiff's fee application is warranted. "It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate." Capitol Records, Inc. v. MP3tunes, LLC, No. 07-CV-9931 (WHP), 2015 WL 7271565, at *5 (S.D.N.Y. Nov. 12, 2015). Accordingly, this Court awards $50,000.00 in attorneys' fees, plus $3,647.50 in costs and disbursements to Garcia.

CONCLUSION

For the reasons set forth in this Opinion and Order, Plaintiff Antonio Bautista Garcia is entitled to $22,012.36 in damages and $53,647.50 in attorneys' fees and costs against Defendants Bad Horse Pizza, Inc. and John Kandel. The parties are directed to submit a proposed final judgment by January 25, 2017.

Dated: January 18, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.